IN RE the marriage of: Lisa M. LEMKE,
Petitioner-Appellant,

v.

Ricky A. LEMKE, Respondent-Respondent.

Court of Appeals

*No. 2011AP1974. Submitted on briefs April 30, 2012.
—Decided July 12, 2012.*

2012 WI App 96

(Also reported in 820 N.W.2d 470.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Janice N. Bensky* and *Jared M. Potter* of *Stafford Rosenbaum LLP*, Madison.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Anthony C. Kraujalis* of *Anthony C. Kraujalis Law Offices*, Janesville.

Before Sherman and Blanchard, JJ., and Charles P. Dykman, Reserve Judge.

¶ 1. DYKMAN, J. Lisa Lemke appeals a 2011 amended divorce judgment which changed a 2007 award of family support to an award of child support with no maintenance. She asserts that the trial court's finding that she failed to show a substantial change of circumstances between her divorce trial and a hearing three years later was clearly erroneous. She also asserts that there was no evidence supporting the trial court's finding that she was shirking employment and education and had a significant earning capacity. She argues that the trial court erred by failing to compare her assumed earning capacity with her ex-husband's known salary. She claims that the money she received as a result of an automobile accident is insufficient to support her. Finally, she contends that the trial court erroneously exercised its discretion by relying on the court's own personal health problems to analyze the injuries she received in the automobile accident. We agree with Lisa on each point and therefore reverse.[1] Because the only credible evidence is that Lisa has no earning capacity due to factors that include the automobile accident, we agree with Lisa that she is entitled to indefinite maintenance. We therefore remand with instructions to set the amount of maintenance payment, on an indefinite basis, in accordance with well-known standards.

## ISSUE

¶ 2. Ricky and Lisa Lemke were married in 1983, when Lisa was eighteen years old and Ricky was

[1] We use the parties' given names for the sake of simplicity in referring to two parties with the same last name.

twenty-seven years old. Except for a very short time when Lisa worked at a fast food restaurant, she did not work outside the home. She was a homemaker and cared for the parties' four children, born in 1986, 1991, 1992, and 1996. In 2005, shortly after this divorce action was filed, Lisa and her children were involved in a serious automobile accident. As a result, she and some of her children were injured, and she has seen doctors and therapists concerning her injuries throughout this divorce proceeding. Whether her current medical status, including the remaining effects of injuries she suffered in the automobile accident, prevents her employment is the central issue in this appeal.

## 2007 DIVORCE

¶ 3. The parties were divorced in February 2007. They stipulated all issues except the questions of child support and maintenance. Judge Roethe concluded that Lisa had been impaired in her ability to earn money as a result of her years of contributions to the marriage, which is a factor weighing in favor of maintenance.[2] Judge Roethe also found that, as a result of the automobile accident, Lisa had complaints of chronic daily headaches, neck injuries, soft tissue injuries, a sprained wrist, and a right knee problem, and that these affected her ability to be gainfully employed. He believed that, at the time of the divorce, Lisa could have been doing more to finish her college education, and should take steps in this regard to increase her employability. He concluded

---

[2] A transcript of the 2007 proceedings is contained only in Lisa's appendix and not in the record on appeal. Ricky does not complain of this, and also refers to Judge Roethe's findings. He did not file his own appendix. We will use the partial transcript contained in Lisa's appendix to examine Judge Roethe's oral decision.

that, with appropriate education and training, Lisa could become self-supporting at a standard of living reasonably comparable to that which she enjoyed during the marriage, if her injuries resolved.

¶ 4. As part of the original proceedings, Judge Roethe considered the report of Michele Albers, a vocational rehabilitation counselor retained by Ricky. Judge Roethe observed that the problem he had with Albers' evaluation was that an evaluator in her position cannot make findings without relying on the findings of doctors as to the physical capabilities of the person, and the 2007 record was devoid of any such medical findings. As we discuss further below, we agree with Judge Roethe's observation.

¶ 5. Judge Roethe examined Lisa's budget and concluded that she and her three minor children had needs of approximately $3500 to $3600 per month, but also observed that, given the joint resources of the parties, "neither party is going to live in the style that they were accustomed to during the marriage." Judge Roethe found that Ricky earned $74,000 per year, and that he should pay family support of $39,000 per year, or $3250 per month. Because Lisa would receive tax credits for the children, that amount would give her a federal tax refund of $927 but a state tax liability of $1857. Judge Roethe limited this family support that Ricky would have to pay Lisa to three years, which is when the parties' second son would graduate from high school: "At that point, I think we . . . better have a review of this entire matter . . . ." Judge Roethe also noted:

> [I]t's important for the Court to set forth what's going to happen in the next three years that may change my views on whether the maintenance should last longer than three years, and one of those is the state of Mrs.

Lemke's health . . . . The second is the state of Mrs. Lemke's education . . . . The third thing is that . . . Mrs. Lemke needs to . . . get herself in[to] the employment market. And the fourth thing is — and this is really going to affect my judgment — what's going to happen to this automobile accident case; because if Mrs. Lemke sustained the injuries that she says she sustained and has been impaired to the extent that [she says] she has been impaired, that wasn't the problem of this marriage. That was the problem of the tort-feasor.

Judge Roethe awarded significant family support for three years due to the fact that Lisa needed support "because of her absence from the job market and all the things I've alluded to" (economic handicap as a result of her contributions to the marriage, and complaints of injuries: headaches, neck injuries, soft tissue injuries, sprained wrist, right knee problem). "At the present time these affect her ability to be gainfully employed."

¶ 6. As Judge Roethe anticipated, just before the three-year period passed, Lisa moved to extend the family support order and to include amounts therein as indefinite maintenance. By this time, Judge Roethe had retired and Judge Forbeck was assigned to the case. Judge Forbeck heard the motion for two days in 2011, and concluded that Lisa's family support should terminate with no maintenance award, and that support for the one minor child remaining at home would be $1140 per month.[3]

## STANDARD OF REVIEW

¶ 7. Standard of review plays a large part in how appellate courts review a trial court's decision to deny

[3] Another child had reached the age of eighteen but was still attending high school, though he was due to graduate in the spring of 2011. The judgment now appealed was filed May 26, 2011. Thus, Lisa had one minor child at home after May 2011.

an extension of maintenance. In *Cashin*, we were faced with a conflict in the standard of review for an extension of maintenance and resolved it by concluding:

> We conclude we should follow the supreme court's decision in *Rohde-Giovanni* and review a trial court's decision to deny an extension of maintenance as a discretionary decision, including the decision whether there is a substantial change in circumstances. Under this standard of review, we affirm the trial court's decision on whether there is a substantial change in circumstances if there is a reasonable basis in the record for the trial court's decision.

*Cashin v. Cashin*, 2004 WI App 92, ¶ 44, 273 Wis. 2d 754, 681 N.W.2d 255 (citing *Rohde-Giovanni v. Baumgard*, 2004 WI 27, ¶¶ 17–18, 269 Wis. 2d 598, 676 N.W.2d 452).

¶ 8. Nonetheless, the supreme court has recognized certain baseline standards in evaluating requests to extend maintenance that could be seen as exceptions to this deferential standard, in the sense that lower courts would be reversed if in the course of exercising their discretion they make, or fail to make, these particular findings. One baseline standard is found in *LaRocque v. LaRocque*, 139 Wis. 2d 23, 35, 406 N.W.2d 736 (1987), where the court noted that "[a] court must not reduce the recipient spouse to subsistence level while the payor spouse preserves the pre-divorce standard of living." In the context of maintenance changes, the court stated: "The circuit court must not prematurely relieve a payor spouse of a support obligation lest a needy former spouse become the obligation of the taxpayers." *Id* . at 41.

¶ 9. Turning to the relevance of efforts made by parties to earn income in this context, the presence or

absence of such efforts are to be considered as factors, but only minor ones. In *Vander Perren v. Vander Perren*, 105 Wis. 2d 219, 229–30, 313 N.W.2d 813 (1982) (citation omitted), the court explained:

> We believe that a party's lack of initiative or effort to become self-supporting is a relevant factor for a court to consider in awarding or terminating maintenance. We do not, however, believe that such considerations may be raised to a determinative status.

Finally, the supreme court has modified the tests courts are to use when determining modification of maintenance issues to improve accuracy and fairness:

> [W]e emphasize that we have moved away from [the unjust or inequitable test] and that the correct test regarding modification of maintenance should consider fairness to both of the parties under all of the circumstances, not whether it is unjust or inequitable to alter the original maintenance award. The unjust or inequitable standard is qualitatively different than the fairness standard, since it seems, in practice, to focus primarily on a single party. We conclude that the fairness standard is the better approach, since there the focus should be on what is fair to both parties, not just one party.

*Rohde-Giovanni*, 269 Wis. 2d 598, ¶ 32 (citations and footnotes omitted).

¶ 10. We explained the "fairness" standard in *Heppner*:

> "Fairness" has a special meaning under the law of maintenance: "We believe that a reasonable maintenance award is measured not by the average annual earnings over the duration of a long marriage but by the lifestyle that the parties enjoyed in the years immediately before the divorce and could anticipate

enjoying if they were to stay married." *LaRocque*, 139 Wis. 2d at 36, 406 N.W.2d at 741. Thus, the recipient spouse is entitled, assuming that the payor spouse's income permits it, to enjoy his or her life at the standard that he or she "could **anticipate** enjoying" but for the divorce. *See Hefty v. Hefty*, 172 Wis. 2d 124, 134, 493 N.W.2d 33, 37 (1992).

*Heppner v. Heppner*, 2009 WI App 90, ¶ 10, 319 Wis. 2d 237, 768 N.W.2d 261.

■

¶ 11. Judge Forbeck first noted that in order to obtain an extension of a maintenance award, there must be a substantial change of circumstances after the divorce. Where a party seeks modification of maintenance payments, "the focus [of a substantial change in circumstances test] should be on any financial changes the parties have experienced." *Rohde-Giovanni*, 269 Wis. 2d 598, ¶ 30. This naturally includes factors that cause financial changes. We believe there is some question as to whether the substantial change of circumstances test applies under the unusual circumstances of this case, in which the initial maintenance award (here, an award of family support) was explicitly premised on a statement by the trial court that it was unable to make determinations as to support and fairness into the future, as required by *LaRocque*, because there were three relevant factors that were highly uncertain and subject to change: (1) Lisa's health; (2) her education and employment; and (3) the effects of the auto accident "that's hanging out there."[4] Thus, while the

---

[4] When a trial court concludes that the relevant circumstances at a divorce trial are unknown, it is conceptually difficult to compare this with the same or different circumstances occurring later. It will always be true that there is a

usual "substantial change in circumstances" test usually compares the degree of change in a relevant circumstance, in 2007 Judge Roethe made no finding concerning these relevant issues. Nevertheless, we next consider whether the circuit court erroneously exercised its discretion when it found that Lisa did not show a substantial change in circumstances.

## 2011 MOTION HEARING— SUBSTANTIAL CHANGE IN CIRCUMSTANCES

¶ 12. We start by considering Lisa's assertion that Judge Forbeck's finding that she did not show a substantial change in circumstances was an erroneous exercise of discretion. In 2011, Ricky was earning $6000 more than in 2007. Lisa's family support had decreased from $3250 per month to $2177 per month and finally $1140 per month, as a result of two children becoming adults. All except $43,000 of the $70,000 she received from the automobile accident settlement had been used to pay attorney fees and credit card bills. She had refinanced her mortgage. As of 2011, two of her adult children were living with her while they attended school. Also new in 2011 was the fact that she had State of Wisconsin health insurance, which costs over $400 per month with a $2500 deductible. In 2011, she paid for all her prescriptions and half of the unreimbursed medical expenses for her children. She did not have this expense in 2007 because she and the children were covered by Ricky's employer's health plan.

---

difference between an unknown factor and a latter known factor, as a matter of logic. But that point of logic may not go far in any given case in helping a court to determine whether a change from the unknown to the known regarding a factor is in fact a change that should be deemed substantial. Fortunately, as we explain later, we do not have to provide an answer to this question.

¶ 13. The following is undisputed health-related testimony presented during the hearing before Judge Forbeck. After the divorce, Lisa developed blood clots in her lungs and was required to take blood thinners. She had surgery on her left shoulder in 2007. In 2008, surgery was performed on her left rotator cuff, her knee, and her left wrist. In 2009, she had surgery on her right shoulder. Lisa's orthopedic surgeon, Dr. Bradley Fideler, believed that the surgeries affected Lisa's ability to work, and though she had taken courses in nursing, she should avoid some of the things that nurses do. He believed that Lisa would have significant difficulty doing the work of a dental hygienist, the other occupation for which she had taken courses.

¶ 14. Lisa was also seeing a psychiatrist, Dr. Charles Ludmer, who specialized in headaches. At the 2011 hearing, he testified that he had diagnosed her as having migraine headaches two or three days a week and chronic daily headaches.[5] He said that Lisa's headaches have been a stubborn problem and that she has had little improvement. Her migraine and other headaches and resulting memory problems affect her ability to obtain employment. When Lisa is having headaches, she is not able to work. Dr. Ludmer testified that a 2007 neuropsychological evaluation demonstrated that Lisa had untreatable, borderline intellectual functioning and some cognitive impairments that would certainly impact Lisa's ability to work. Dr. Ludmer testified that this had not changed.

¶ 15. At the 2011 motion hearing, Ricky did not call any medical witnesses to establish any facts or to refute the testimony of Lisa's surgeon and psychiatrist.

---

[5] Judge Roethe did not find that Lisa had migraine headaches in 2007.

However, he elicited testimony from Albers, the vocational rehabilitation counselor who had provided a report as part of the 2007 proceedings. Albers opined that Lisa was not a candidate for employment as a nurse, but had an earning potential of $18,000 to $29,000 annually, depending on whether she was performing unskilled labor or, with further education, employment requiring an associate of arts degree. Ricky's only other witnesses were himself and the attorney who handled Lisa's automobile accident litigation. Neither of them claimed medical training nor testified about Lisa's surgeries, headaches, or medical condition.

¶ 16. We have reviewed this evidence as it relates to whether Lisa proved that a substantial change of circumstances had occurred between the 2007 divorce and the 2011 motion hearing. Ricky does not contest the validity of the parties' circumstances we have noted above. He does not discuss the five surgeries Lisa underwent after the 2007 divorce hearing, nor the standards used by Lisa's doctors. Instead, he claims: "There was no evidence to indicate that Lisa had any new health concerns." Judge Forbeck found that Lisa's health problems were a result of the automobile accident and might have been exacerbated over time. He said that he would "go into what I see [as] the reasons for that exacerbation." However, the record does not contain those reasons. Ricky does not claim that Lisa's family support was different from that which we have noted, or that his income has not increased. He assumes, as did Judge Forbeck, that Lisa's failure to obtain gainful employment requires termination of her family support or maintenance.

¶ 17. We have considered all of the evidence in the record that was before Judge Forbeck tending to show

or negate a change of circumstances. Based on that review, summarized above and summarized in greater detail below, we conclude that Judge Forbeck's decision that Lisa did not prove a substantial change in circumstances at the 2011 motion hearing was an erroneous exercise of discretion. *See Rohde-Giovanni*, 269 Wis. 2d 598, ¶ 18 ("A circuit court engages in an erroneous exercise of discretion when it fails to consider relevant factors, bases its award on factual errors, makes an error of law, or grants an excessive or inadequate award." (citation omitted)).[6] And, as stated above, based on this same record it also logically follows that were we to use what amounts to de novo review of the change of circumstances question in light of the heavily contingent decision Judge Roethe made in 2007, concluding in essence that he was unable to make relevant findings, we would also reverse. But we have no need to consider this possible alternative standard of review and do not do so.

## THREE OTHER ISSUES

¶ 18. Lisa argues that Judge Forbeck erred regarding three other issues. First, she asserts that Judge Forbeck erred when, in finding that Lisa had not shown a substantial change in circumstances, he noted that:

---

[6] Judge Forbeck used the erroneous "unjust or inequitable" standard in deciding whether a substantial change in circumstances had occurred. *See supra* ¶ 9 (explaining that the Wisconsin Supreme Court has "moved away" from the "unjust or inequitable" standard). "A circuit court engages in an erroneous exercise of discretion when it . . . makes an error of law . . . ." *Rohde-Giovanni v. Baumgard*, 2004 WI 27, ¶ 18, 269 Wis. 2d 598, 676 N.W.2d 452 (citing *Olski v. Olski*, 197 Wis. 2d 237, 243 n.2, 540 N.W.2d 412 (1995)).

"[M]ost of the problems that [Lisa] has had are attributable to the auto accident and not to the marriage." The meaning of this statement is not clear. If Judge Forbeck intended this to represent a finding that Lisa's $70,000 settlement relieved Ricky of any obligation to support Lisa, that conclusion is incorrect. Wisconsin Stat. § 767.56(2) (2009–10)[7] requires a court to consider the physical health of the parties, and does not suggest that health problems that have been the subject of settlement proceeds may be ignored.[8] Section 767.56(3) requires trial courts to consider the parties'

[7] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

[8] Judge Roethe considered Lisa's automobile accident and said: "[The automobile accident] wasn't the problem of this marriage. That was the problem of the tort-feasor." Judge Forbeck repeated this concept: "In this particular case, most of the problems that she had are attributable to the auto accident and not to the marriage." But *Richardson v. Richardson*, 139 Wis. 2d 778, 786, 407 N.W.2d 231 (1987), discussing a property division issue, held:

> [C]ompensation for loss of bodily function, for pain and suffering and for future earnings replaces what was lost due to a personal injury. Just as each spouse is entitled to leave the marriage with his or her body, so the presumption should be that each spouse is entitled to leave the marriage with that which is designed to replace or compensate for a healthy body. We therefore conclude that the statutory presumption of equal distribution should be altered . . . . Instead of presuming equal distribution of a personal injury claim, the court should presume that the injured party is entitled to all of the compensation for pain, suffering, bodily injury and future earnings.

*Krebs v. Krebs*, 148 Wis. 2d 51, 55–57, 435 N.W.2d 240 (1989), applied the holding in *Richardson* to future payments under a structured settlement arising out of an automobile accident. Moreover, even if an accident settlement is relevant to a maintenance award, Lisa received $70,000 without any breakdown as to the components of that settlement. The settlement

763

property. There is no qualifier in § 767.56 relieving parties of the requirement to support each other if one of the parties receives a monetary award for injuries received in an accident.

¶ 19. The second issue Lisa raises is a challenge to Judge Forbeck's conclusion that Lisa was shirking. He said:

> I find that the situation that we're in is almost like the never ending gob stopper [a large, hard piece of candy]. I don't see that Mrs. Lemke has done one thing to try to improve her economic situation. I think she has sat back and done nothing, and she expects someone else to take care of her. I don't think that's the obligation of an ex-spouse . . . . She did nothing. She has various reasons why she said she did nothing . . . . There was no effort, no trying. She appears to be in a malaise where she just decides she's not going to do anything . . . .
>
> . . . I don't think that she has done anything. That's the problem I see. She's done nothing to go forward, other than sit around and feel sorry for herself.
>
> Mrs. Lemke, . . . I think you've made a choice that you're not going to do anything for yourself to earn monies, and you want everybody else around you to support you. . . . There's no excuse for doing what you've done so far to date.
>
> . . . [Y]ou're never gonna stop doing what you're gonna do as long as you keep getting handouts, and I don't know how I prevent that from happening . . . .

document Lisa signed is silent as to this. Neither Judge Forbeck nor we have any way to know, based on the existing record, what portion of Lisa's settlement was allocated to her loss of future earnings.

... [Y]ou do need to have additional monies in order to support yourself. But you're the one that's got to get those monies. People aren't giving you money.

■

¶ 20. The initial problem with Judge Forbeck's conclusion that Lisa had shirked employment, requiring the termination of her family support, is that it ignores the requirement in WIS. STAT. § 767.56(5) that a divorce court consider the parties' "earning capacity." Once Judge Forbeck accepted Albers' 2011 opinion that Lisa had an earning capacity of between $18,000 and $29,000, he was required to use that opinion to compare Lisa's earning capacity with Ricky's earning capacity, an undisputed $80,460 per year. Judge Forbeck did not do that; instead, he terminated Lisa's family support/maintenance. Had Judge Forbeck compared Ricky's and Lisa's earning capacity, he was then required to determine whether, given Ricky's actual earnings and Lisa's imputed earnings, they were able to enjoy the lifestyle they enjoyed during their marriage. *See LaRocque*, 139 Wis. 2d at 35. A trial court must consider the earning capacity of both parties to a divorce. WIS. STAT. § 767.56(5). It does not matter if a party's income is actual or imputed. Section 767.56(5) uses the words "earning capacity," not "income."

■

¶ 21. A third issue is Lisa's assertion that Judge Forbeck erred by using his personal experiences with ailments he believed to be similar to Lisa's as a basis for his decision. "A trial court sitting as a fact-finder may derive inferences from the testimony and take judicial notice of a fact that is not subject to reasonable dispute, but it may not establish as an adjudicative fact that which is known to the judge as an individual." *State v. Peterson*, 222 Wis. 2d 449, 457, 588 N.W.2d 84 (Ct. App.

1988) (citation omitted). The reason is that the judge becomes an "impermissible surrogate witness" for that evidence. *See State v. Sarnowski*, 2005 WI App 48, ¶ 15, 280 Wis. 2d 243, 694 N.W.2d 498. While Lisa correctly cites relevant authority on this issue, she does not recognize that, if she is correct in her other claims of error and remand is ordered, Judge Forbeck's comparison of his ailments to hers is only relevant to disqualification on remand pursuant to WIS. STAT. § 801.58(7), which provides:

> If upon an appeal from a judgment . . . the appellate court . . . reverses or modifies the judgment . . . as to any or all of the parties in a manner such that further proceedings in the trial court are necessary, any party may file a request [for substitution of judge] within 20 days after the filing of the remittitur in the trial court . . . .

Because our remand requires only an award of maintenance, whether Judge Forbeck's ailments are similar to Lisa's will not be an issue on remand. So, unless we ignore Lisa's assertions regarding this issue, the only question is the applicability of WIS. STAT. § 801.58(7) here.

¶ 22. Judge Blanchard's concurrence explains the dilemma we face. Lisa wants relief from Judge Forbeck's use of his personal experience with ailments similar to Lisa's to reach his conclusion terminating her family support. As we explain later, Judge Forbeck's decision terminating any future maintenance is without evidentiary support, and we therefore reverse. But Lisa asks for relief resulting from the "personal experience" issue. The only possible relief for her complaint is through the use of WIS. STAT. § 801.58(7). Otherwise, we tell her that we agree with her argument, but she receives no remedy.

The difference between our opinion and the concurrence is that we give Lisa a remedy and the concurrence does not. While the concurrence is correct that Lisa's briefs are not specific as to § 801.58(7) relief, we think the briefs adequately explain her concern with the "personal experience" issue, and her desire for relief from Judge Forbeck's error as to that issue.

¶ 23. WISCONSIN STAT. § 801.58(7) and its predecessors have had an extensive appellate life. *See, e.g., State ex rel. J.H. Findorff & Son, Inc. v. Circuit Court for Milwaukee Cnty.*, 2000 WI 30, 233 Wis. 2d 428, 608 N.W.2d 679; *Parrish v. Kenosha Cnty. Circuit Court*, 148 Wis. 2d 700, 436 N.W.2d 608 (1989); *State ex rel. Tarney v. McCormack*, 99 Wis. 2d 220, 298 N.W.2d 552 (1980); *Hubert v. Winnebago Cnty. Circuit Court*, 163 Wis. 2d 517, 471 N.W.2d 615 (Ct. App. 1991); *State ex rel. Ondrasek v. Circuit Court for Calumet Cnty.*, 133 Wis. 2d 177, 394 N.W.2d 912 (Ct. App. 1986). These decisions, however, do not appear to consistently determine the result when a request for judicial disqualification is made under § 801.58(7). "When the decisions of our supreme court appear to be inconsistent, we follow its most recent pronouncement." *Spacesaver Corp. v. DOR*, 140 Wis. 2d 498, 502, 410 N.W.2d 646 (1987) (citation omitted). Here, the most recent pronouncement concerning the breadth of § 801.58(7) lies in *Findorff*.

¶ 24. While we do not take sides on the issue, the majority and Justice Bradley's concurrence in *Findorff* do not agree on the result in divorce cases when, after remand, a WIS. STAT. § 801.58(7) request for substitution is made. Both the majority and Justice Bradley's opinions cite previous cases for their conclusions.

¶ 25. The *Findorff* majority opinion defines the reach of the statute broadly: "Defining 'further proceedings' to encompass any proceeding in which a judge will exercise discretion guarantees that the right of substitution may attach to the greatest number of cases. By this definition we intend to uphold a party's right to a fair disposition of its case." *Findorff*, 233 Wis. 2d 428, ¶ 23. While one could argue that *Findorff* was not a divorce case, the majority was certainly aware of that fact, since Justice Bradley's concurrence was specific as to that issue: "Perhaps the majority could have borrowed and refined the statutory construction from the context of remand in divorce proceedings that delimits substitution when a remand calls for the clarification of judgment on an existing record." *Id.*, ¶ 65 (Bradley, J., concurring).[9] *Findorff*'s expansive interpretation of Wis. Stat. § 801.58(7) is the last word on this subject and is applicable to all cases, including divorce cases.

¶ 26. Here, our remand is for "further proceedings," which will address a new issue: the maintenance Lisa is entitled to under facts existing when a court decides that issue. Lisa is premature in asserting her "comparison of ailments" issue under the unique circumstances of this appeal. She can decide if the issue she has identified is significant enough to require a substitute judge when this case is remanded.

TERMINATION OF MAINTENANCE

¶ 27. We have concluded that Judge Forbeck's determination that Lisa did not prove a substantial

---

[9] See Justice Wilcox's concurrence for a similar interpretation. *State ex rel. J.H. Findorff & Son, Inc. v. Circuit Court for Milwaukee Cnty.*, 2000 WI 30, ¶ 42 n.3, 233 Wis. 2d 428, 608 N.W.2d 679.

change of circumstances was an erroneous exercise of discretion. We therefore need to examine the evidence adduced by Lisa and Ricky in support of their positions on maintenance as part of our obligation to search the record for evidence in support of Judge Forbeck's decision. Resolving a claim of substantial change of circumstances turns on the facts of each case. Here, the same facts relevant to a substantial change of circumstances finding are the facts we examine to decide whether the evidence adduced is sufficient to support Judge Forbeck's ultimate conclusion to terminate Lisa's maintenance.

¶ 28. Sufficiency of evidence is a question of law, which we review de novo. *See Walter v. Cessna Aircraft Co.*, 121 Wis. 2d 221, 231, 358 N.W.2d 816 (Ct. App. 1984) (citation omitted). When faced with inadequate findings of fact, an appellate court may: "(1) look to an available memorandum decision for findings and conclusions; (2) review the record anew and affirm if a preponderance of the evidence clearly supports the judgment; (3) reverse if the judgment is not so supported; or (4) remand for further findings and conclusions." *Minguey v. Brookens*, 100 Wis. 2d 681, 688, 303 N.W.2d 581 (1981) (citations omitted). Thus, we need to decide whether the facts the parties presented are adequate or inadequate to support a decision terminating Lisa's continued maintenance, or whether those facts exist, but the trial court failed to find them. This will determine our mandate.

## WITNESSES

¶ 29. We now take the witness testimony one witness at a time, once again repeating that we will look for reasons to sustain Judge Forbeck's discretionary decision. *See Murray v. Murray*, 231 Wis. 2d 71, 78, 604 N.W.2d 912 (Ct. App. 1999).

*Doctor Bradley Fideler*

¶ 30. As explained above, Dr. Fideler is an orthopedic surgeon. He first saw Lisa in 2008 for left shoulder and left wrist problems not resolved by previous operations. Dr. Fideler operated but Lisa continued to have pain in the acromioclavicular (AC) joint, so Dr. Fideler performed another operation. Lisa also had pain in her right shoulder so Dr. Fideler operated there in March 2009. He said that it was not uncommon at all for a patient having rotator cuff damage and tearing to have persistent symptoms. He did not put specific limitations on Lisa because she was unemployed, so he allowed her to continue with activity as tolerated. This did not mean that Lisa was capable of unrestricted activity. Dr. Fideler expected that the surgeries on Lisa's shoulders and wrist could affect her ability to work. He concluded that Lisa could work in some capacity, assuming she had no other physical injuries that might limit her ability to work. He had discussions with Lisa on many occasions that certain work environments would not be in her best interest. He believed that Lisa would have significant problems with being a nurse or dental hygienist. Significantly, Ricky's and Judge Forbeck's reliance on Dr. Fideler's failure to place limitations or restrictions on Lisa ignores the reason Dr. Fideler gave for not placing limitations or restrictions on her, namely, that she was unemployed so there were no limitations to consider.

*Doctor Charles Ludmer*

¶ 31. As we have noted, Dr. Ludmer is a psychiatrist who treated Lisa. He runs a headache clinic, and first treated Lisa in 2006. He believed that Lisa was experiencing chronic headaches and migraine head-

aches, which interfered with Lisa's ability to function. At the time of the 2011 motion hearing, he was examining her every six months. He testified that Lisa has a very stubborn headache problem and needs preventative medications. Periods of stress exacerbate the headaches. There has been little improvement. Lisa continues to have severe headaches two or three times a week and persistent headaches on other days. Severe headaches interfere with Lisa's ability to function and to concentrate because of the pain. This can affect her memory and physical stamina. Headaches like Lisa's can interfere with a person's ability to concentrate and to attend to whatever it is she needs to learn, which affect her ability to remember things. Because headache conditions can be disabling, in the presence of Lisa's other symptoms, she could be considered considerably disabled. Being in a dark room can help with Lisa's symptoms. Dr. Ludmer concluded: "[W]hen she's having the headache, and she's describing them as occurring two to three times a week, during the period of those headaches, I would say, yes, she's not able to work." Dr. Ludmer also commented on a neuropsychological evaluation which demonstrated a problem—Lisa had borderline intellectual functioning and some cognitive impairments which would certainly impact her ability to work. This was not treatable, Dr. Ludmer testified.

*Kevin Schutz*

¶ 32. Like Albers, Kevin Schutz is a vocational rehabilitation counselor. He interviewed Lisa in 2010 and administered a formal psychometric instrument, which is an academic achievement measure to identify

academic function. Lisa gave the test her full effort but struggled on some aspects. She took a long time to perform the test.

¶ 33. Schutz also reviewed a report prepared by Dr. Denise Fiducia, who had given Lisa a neuropsychological evaluation. Schutz testified that Dr. Fiducia found that Lisa had difficulty with activities or tasks that would generally fall within the cognitive realm, and that Lisa had problems with her memory, information processing, processing speed, and the ability to use information that she has been given. Schutz stated that Dr. Fiducia had ruled out malingering and had "ruled out that this is being faked." Schutz testified that Dr. Fiducia's conclusions became part of the foundation for his opinions.

¶ 34. In preparation for his testimony, Schutz reviewed Lisa's medical records, the functional deficits described in the records, and the results of his examination of Lisa. His opinion was that Lisa was not able to perform in sustained employment, that she did not have an earning capacity, and that she was not employable. He believed that this condition was permanent. He updated his report in preparation for Lisa and Ricky's hearing. Schutz's report concluded:

> Considering all of the limiting issues documented and described, Ms. Lemke presents as a very unlikely individual to effectively complete the requirements of competitive work. Considering all of those factors, she is not likely to have the ability to perform the quality, quantity, and in particular, the dependability of services necessary to sustain competitive employment.

Consistent with the above, there is nothing in Schutz's testimony or exhibits which supports Judge Forbeck's conclusion that Lisa was able to work, but was shirking.

*Matthew DeVos*

¶ 35. Matthew DeVos was Lisa's trial attorney in her automobile accident case. He testified regarding the insurance companies involved in the case, and the settlements received. Lisa, Ricky, and the children received settlements. DeVos was still trying to settle some medical claims and had $4000 of Lisa's settlement to work with. He believed that eventually she would receive in the range of $2000 after the 2011 motion hearing. Ricky examined DeVos about settling the case for less than the insurance limits of the three cars involved in the accident. DeVos refused to explain why he did not take the case to trial because that was his work product. He said nothing about Lisa's health nor did he give any testimony otherwise bearing on her then-present employability.

*Ricky Lemke*

¶ 36. Ricky testified as to his financial condition and employment at Beloit College. His budget reflected an ongoing payment of $1500 per month for his divorce attorney's services related to other family issues. Ricky testified that Lisa's health was good when the two last lived together in March 2005, but his observations of Lisa were very limited after that time. He said that, in May 2005, he observed her holding their eight-year-old daughter on her lap at a sporting event, and a week later saw her running to her automobile without a knee brace. He saw her without a knee brace at a hearing in the divorce case but with a knee brace at a later hearing. He did not know when the knee brace was prescribed. He knew that Lisa had taken college courses in 2005 and 2006. Ricky testified that he and Lisa rarely spoke after they separated.

773

¶ 37. There is nothing in Ricky's testimony to support his position that Lisa was employable to any degree in any capacity in 2011. Ricky's testimony adds nothing not already reflected in Lisa's own testimony.

*Lisa Lemke*

¶ 38. Lisa's testimony on direct examination provides no support for Judge Forbeck's decision terminating maintenance. Lisa testified about the pain she experiences in her back:

> Well, in addition to this – when we were thrown around in the car – I mean, I've got back pain from my neck all the way down to my bottom. But in the lumbar region, I have bulging discs and what they call stenosis and degenerative – some kind of degenerative disease.

She testified that she needs to use ice packs on her back at night. She explained what she does when she gets migraine headaches:

> I have to – you know, I hope that I'm at home when I have them, first of all, because I need to usually go someplace that's really dark, there's no noise, [because] noise will make it even worse, and take the medicine that he's given me, but there's still times that I'll vomit from it. You know, I get extremely nauseous. I mean, they're really hard to deal with.

As for her other headaches, she said: "Well, ever since we got hit by the – you know, both the cars behind us, you know, I have pain in the back of my head all the time and in the front, and it never goes away."

¶ 39. On cross-examination, Lisa testified that she was enrolled in school in 2007, but had to withdraw. She did not have any counseling, training, or résumé assistance because her health has been too bad. From

774

1983 to 1986, she attended the University of Wisconsin. She attended Beloit College in 1986 and received B+ grades in two classes. In 2003, Lisa attended Blackhawk Technical College and took courses in developmental psychology, anatomy, and physiology, for which she received As. In 2004, she attended Rockford College and received As in photography and gym. In 2005, before her automobile accident, she took a course at Blackhawk Technical College. After the accident she received an A in biochemistry, and in the fall of 2006, received an A in sociology.[10]

---

[10] Lisa explained the courses she took after her divorce, at Blackhawk Technical College, and their rigor. In the fall of 2005, she took biochemistry. Much of the class was laboratory work, which the students did together. She testified: "We each kept our own notebook, but I mean, basically – I'm not gonna say copied off each other, because it was a group effort. You get a group product, or whatever you want to call it." In the spring of 2006, Lisa took anatomy and began receiving C and D grades on quizzes. She switched to a different section that was taught more like a high school course. The students would fill in the blanks on notes. They did not have to read anything, and the students did not have to take notes. In the fall of 2006, Lisa took sociology along with her son, Christopher. The professor wanted to look at society through movies, "so we did nothing but watch movies and learn from movies." Lisa's son was a "huge movie person," so he was able to help her. Sociology was a prerequisite for nursing classes. Lisa enrolled in a class in the spring of 2007, but after two or three weeks, "I ended up having to drop out of it because it was too overwhelming. I couldn't take – that was the first class I really – it was on me to take notes, to have, you know, recall for tests; and, you know, my memory isn't good. I can't remember – I had to do my own reading, and I can't remember what I've read so – and my headaches were really, really bad."

Judge Forbeck did not find that Lisa was not telling the truth about her post-divorce school experiences, although he

¶ 40. Lisa testified that, since her last surgery in 2009, she has not been able to seek any employment. She drives her daughter to school unless her headache is too bad or her back is hurting too much. She helps her daughter with her homework, but has difficulty helping with middle school course levels. Usually, one of the children makes dinner.

¶ 41. Cross-examination and redirect examination provided nothing to support Judge Forbeck's decision to terminate Lisa's maintenance. Ricky's interest in Lisa's education in 2006 tells us nothing about the medical problems her two doctors observed later. For instance, Dr. Ludmer, who first saw Lisa in May 2006, noted that Lisa has had increased academic difficulty, stopped taking courses in April 2007, and had to drop out of school in the spring of 2007.

*Michele Albers*

¶ 42. Albers testified that in 2011 Lisa had an earning capacity of between $18,000 and $29,000, depending on whether she obtained an associate of arts degree. Albers personally observed outward manifestations of Lisa's impairments, which included difficulty in lifting and carrying with her left arm. She knew that Lisa's left knee was worse since surgery and gave out more often. At the 2011 hearing, when questioned as to why her 2007 report did not address the physical

---

did comment that: "she did not make any effort to either get further education, to get into any kind of vocational rehabilitation counseling, she never applied for a job." Without a finding by the court that this testimony was untrue, Ricky's argument that Lisa's failure to continue with her education evidenced her intent to "sit around and feel sorry for herself" is unhelpful to our review and could not support the court's ultimate conclusion.

difficulties Lisa reported to Albers, Albers replied: "[A]s I stated earlier, I'm not a physician. I don't have a medical license. I don't impose functional limitations on people. I look to the treating providers, practitioners and physicians to provide me with any functional or emotional limitations that a person might have." She testified in 2011 that she did not give any credence to Lisa's 2007 symptoms "because there was no[] objective medical documentation to support it." She further explained that in 2011 she gave no credence to any of Lisa's reports of physical problems because, she submitted, there was no objective medical documentation to support a conclusion that Lisa had any physical limitations.

¶ 43. Albers was asked: "If Dr. Ludmer were to say that Ms. Lemke's chronic headaches interfered with her ability to either obtain or maintain employment, would you defer to his judgment?" Albers replied: "No, because he is a physician and not a vocational rehabilitation counselor. I don't believe – I believe that's outside of his area of expertise to say whether someone can obtain or maintain a job." Albers nevertheless conceded that employers are not going to tolerate an employee who has to lie down or go in a dark room at unpredictable times of the day, or takes numerous breaks and is off task in his or her job.

¶ 44. In sum, at the 2011 hearing Albers testified, in effect, that she considered Lisa to be an able-bodied person, in the sense that she was employable in full-time, permanent positions, with the exception that she could not be employed as a nurse. Albers apparently drew this latter conclusion from Dr. Fideler's report of May 11, 2009, which gave a weight-lifting restriction of nothing heavier than fifteen to twenty pounds and limited reaching above shoulder level.

¶ 45. However, as discussed above, the doctors who testified described Lisa's capacity as dramatically different. Because Albers ignored Lisa's subjective complaints, Albers was not giving an opinion about Lisa, as Lisa's doctors' testimony showed. Instead, Albers assumed, against the only medical evidence, that in 2011 Lisa was a completely able-bodied person who could engage in any occupation for which she was qualified except for that of nurse. As Lisa's doctors explained, Lisa is not that person. For instance, Dr. Fideler testified that Lisa would have significant problems with being a dental hygienist. Albers did not exclude this occupation from Lisa's possible employments. Nor did Albers consider Lisa's borderline intellectual functioning. To cite another example, Dr. Ludmer considered Lisa's headache condition to be so severe that she could be considered significantly disabled. Again, Albers ignored Lisa's headaches, apparently because they are subjective complaints, which Albers rejected, even though the complaints were corroborated by the only medical testimony.

¶ 46. Albers' deeply flawed rejection of subjective complaints as affecting employability or earning capacity does not square with Wisconsin law. By accepting Albers' opinion rejecting subjective symptoms as credible, Judge Forbeck ignored a body of Wisconsin law which holds that subjective symptoms are a basis for a fact finder's decision which is dependent on those symptoms. While Judge Forbeck might have rejected Lisa's doctors' opinions for some rational reason, he did not state such a reason on the record, and we see no apparent reason to disbelieve the doctors.

¶ 47. In *Klingman v. Kruschke*, 115 Wis. 2d 124, 127, 339 N.W.2d 603 (Ct. App. 1983), we concluded that a plaintiff's statements and an examination by a chiro-

practor were reasonably relied upon by the chiropractor to form a basis for the chiropractor's opinions. The court said: "[The plaintiff]'s statement about neck stiffness provided the foundation for [the chiropractor's] conclusion that the accident caused the injuries." *Id.* at 127–28. Workers' compensation law is filled with doctors' testimony that an applicant has a temporary or permanent loss of earning capacity. *See, e.g., Mednicoff v. DILHR*, 54 Wis. 2d 7, 10–11, 194 N.W.2d 670 (1972); *Kurschner v. DILHR*, 40 Wis. 2d 10, 12–13, 161 N.W.2d 213 (1968); *Langhus v. LIRC*, 206 Wis. 2d 494, 497, 557 N.W.2d 450 (Ct. App. 1996).

■■ ■■

¶ 48. We conclude that far from being credible, as Judge Forbeck determined, Albers' testimony depended upon rejecting Lisa's subjective symptoms relied upon by her doctors. While we rarely upset trial courts' credibility determinations, we do so when a credibility finding is clearly erroneous. *Lessor v. Wangelin*, 221 Wis. 2d 659, 665–66, 586 N.W.2d 1 (Ct. App. 1998) (citation omitted). Here, in the face of undisputed medical evidence to the contrary, the trial court's finding that Albers' deeply flawed testimony was credible is clearly erroneous.

¶ 49. As we have noted, Judge Forbeck did not find Lisa's doctors' testimony incredible. With the exception of finding some of Lisa's stated reasons for not working or attending school incredible, Judge Forbeck did not find the rest of her testimony or other reasons for Lisa not working incredible. We do not know which of Lisa's stated reasons Judge Forbeck found credible and which he found incredible. Nor did Judge Forbeck find the testimony of Lisa's mother incredible. Lisa's mother supported Lisa's testimony as to Lisa's disability. The only direct evidence as to Lisa's disabilities and

inability to work or attend school which could lead to employment was therefore that of Schutz, whose report (exhibit 3) noted that Lisa spends more than 50% of a typical day lying down to rest or recuperate from activity-based symptom flare ups.

## CONCLUSION

¶ 50. We have reviewed all the relevant evidence looking for reasons to sustain Judge Forbeck's discretionary decision. We have found none. To review, Albers, the witness Judge Forbeck found credible, considered Lisa an able-bodied person, capable of unrestricted activities with the exception of being a nurse. We conclude that Judge Forbeck's credibility determination was clearly erroneous for the reasons we have given.

¶ 51. The main issue in this case was why Lisa did not have gainful employment or did not attend school that could lead to employment. As also occurred during proceedings in 2007, Ricky produced no medical witnesses in 2011 to dispute medical testimony about Lisa's disabilities. Indeed, except for Albers' opinion as to Lisa's earning capacity, which we have determined to be without substance because it contradicts the only medical testimony, there is no evidence whatsoever to support Judge Forbeck's conclusion that Lisa had an earning capacity and was therefore shirking. With no testimony from which Judge Forbeck could reasonably find facts countering Schutz's testimony, the only evidence is Schutz's opinion that Lisa has no earning capacity. Judge Forbeck found that the testimony of Schutz was not credible: "The problem I had with Mr. [Schutz] was that basically what he said to me is that she can't do anything. She can't go forward. She's not able to perform sustained employment at this time. He felt it was permanent. I listened to that testimony, and

I do not find that credible." Judge Forbeck's written finding was: "The testimony of Kevin [Schutz] is not credible, basically when he says [Lisa] cannot do anything and she is not able to perform sustained employment at this time, and that it was permanent."

¶ 52. As explained above, Schutz's opinion was based on medical evidence from Dr. Fideler and Dr. Ludmer. Of course, it is in the very nature of expert testimony that an expert witness frequently gives testimony that conflicts in small or large ways with that of other expert witnesses. An expert witness may not be credible if his or her opinion is drawn from incorrect facts, or the witness exhibits non-verbal signs of deception when testifying. But the fact that two witnesses differ does not, without more, make the testimony of one incredible because of the difference in opinion. Although appellate interference with a trial court's credibility determination is rare, we conclude that Judge Forbeck's credibility determination as to Schutz's testimony is clearly erroneous. "When a trial court makes findings of fact as to the credibility of witnesses, we will not upset those findings unless they are clearly erroneous." *Lessor*, 221 Wis. 2d at 665–66.

¶ 53. We conclude that Lisa has shown a substantial change of circumstances, and Ricky has again failed to provide medical evidence which challenges Lisa's medical evidence and Schutz's opinion drawn from that evidence. The problem is twofold. First, as we have noted repeatedly, there is no medical evidence to support Ricky's assertion. Evidence sufficiency is reviewed de novo. *Walter*, 121 Wis. 2d at 231. Second, there are inadequate facts to support Ricky's assertion.

¶ 54. We have explained our four choices when faced with inadequate facts. We choose to reverse. While a remand on the changed circumstance question

781

would be the more common approach, we think that having failed to provide necessary witnesses twice, Ricky should not be given a third chance to make his case. Lisa does not have the resources for continued litigation. Her first attorney successfully petitioned for discharge because Lisa could not or would not pay the necessary retainer and fees for expert witnesses. Lisa should not be forced to undergo a third trial because Ricky chose not to present relevant evidence, while Lisa did present relevant evidence. The only vocational evidence we have determined to be relevant and credible was Schutz's testimony that Lisa was unable to perform and sustain employment and that this inability was permanent.

¶ 55. The amount of maintenance is another matter. This was originally litigated in 2007. The parties' circumstances have changed significantly. More to the point, an appellate court does not find facts or exercise discretion. *See Harwick v. Black*, 217 Wis. 2d 691, 703, 580 N.W.2d 354 (Ct. App. 1998) ("The court of appeals is not a fact-finding court." (citation omitted)); *Steinbach v. Gustafson*, 177 Wis. 2d 178, 185–86, 502 N.W.2d 156 (Ct. App. 1993) (discussing the limited scope of our review of discretionary rulings). Therefore, our mandate is a reversal, with instructions to set indefinite maintenance in an amount consistent with the cases we have cited, the statutory factors found in Wis. Stat. § 767.56, the twin concepts of need and fairness, and the rationale of *LaRocque*, 139 Wis. 2d 23.

*By the Court.*—Judgment reversed and cause remanded for further proceedings.

¶ 56. BLANCHARD, J. (*concurring*). I agree with the majority's decision in all respects, except that I believe that its discussion in ¶¶ 21–26 regarding "dis-

qualification" on remand is not appropriate. Accordingly, I concur and respectfully explain my narrow reservation.

¶ 57. In my view, the majority begins correctly by identifying Lisa's objection to Judge Forbeck's extensive references to his own ailments as problematic under *State v. Peterson*, 222 Wis. 2d 449, 588 N.W.2d 84 (Ct. App. 1998), and *State v. Sarnowski*, 2005 WI App 48, 280 Wis. 2d 243, 694 N.W.2d 498. However, the majority then pivots to a topic that Lisa does not raise, stating that she "does not recognize" that her point is "only relevant to disqualification" in the event of remand. In my view, Lisa made a relevant and persuasive argument that Judge Forbeck appears to have substituted his personal experiences for the only medical evidence in the record, and this contributes to her position that the court committed clear error in concluding that she was shirking. It is therefore not a question, as the majority states, of either ignoring Lisa's assertions or addressing substitution on remand. Instead, I believe that Lisa's assertions should be addressed in connection with the question of whether the court committed clear error on the shirking issue, as she requested. As for the topic of substitution, it was not raised by either party. I would leave potential substitution issues, if any, to the parties on remand, and to the circuit court as issues might arise. It does not add to the analysis for the majority to call this discussion a remedy.