**2019 WI App 55**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:        2018AP1215

Complete Title of Case:

IN THE MATTER OF LIBERTY MILK MARKETING COOPERATIVE:

DANIEL R. FREUND, AS RECEIVER FOR LIBERTY MILK MARKETING COOPERATIVE,

     PLAINTIFF-RESPONDENT,

   V.

NASONVILLE DAIRY, INC.,

     DEFENDANT-APPELLANT.

| | |
|---|---|
| Opinion Filed: | September 10, 2019 |
| Submitted on Briefs: | January 22, 2019 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Seidl, JJ. |
|     Concurred: | |
|     Dissented: | |

| | |
|---|---|
| Appellant<br>ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Thomas Wickham Schmidt* of *Davis & Kuelthau, S.C.*, Green Bay. |
| Respondent<br>ATTORNEYS: | On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Joshua D. Christianson*, Eau Claire. |

| | |
|---|---|
| **COURT OF APPEALS**<br>**DECISION**<br>**DATED AND FILED**<br><br>**September 10, 2019**<br><br>Sheila T. Reiff<br>Clerk of Court of Appeals | **NOTICE**<br><br>This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.<br><br>A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62. |

| | |
|---|---|
| **Appeal No.    2018AP1215** | Cir. Ct. No. 2014CV421 |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS** |

---

IN THE MATTER OF LIBERTY MILK MARKETING COOPERATIVE:

DANIEL R. FREUND, AS RECEIVER FOR LIBERTY MILK MARKETING COOPERATIVE,

    PLAINTIFF-RESPONDENT,

  V.

NASONVILLE DAIRY, INC.,

    DEFENDANT-APPELLANT.

---

       APPEAL from a judgment of the circuit court for Chippewa County: JAMES M. ISAACSON, Judge. *Affirmed*.

       Before Stark, P.J., Hruz and Seidl, JJ.

    ¶1    HRUZ, J.  Nasonville Dairy, Inc. ("Nasonville") appeals a judgment awarding $290,000 to Daniel Freund, as receiver for Liberty Milk Marketing

Cooperative ("Liberty"). Following a bench trial, the circuit court concluded that Nasonville's receipt of a $290,000 payment from Liberty, which occurred less than one month prior to when Liberty entered receivership, constituted a preferential transfer that disadvantaged Liberty's other similarly situated creditors. The court concluded the preference was voidable and ordered that Freund recover the $290,000 payment from Nasonville.

¶2 The first issue on appeal concerns a question of statutory interpretation regarding what elements must be proved to render a preference voidable under WIS. STAT. § 128.07(2) (2017-18).[1] We conclude a preference is voidable under that subsection if (provided the other statutory requirements have been satisfied) an ordinarily prudent business person would, under the circumstances, have reasonable cause to believe both that the transferor is insolvent and that the effect of the transfer would be to enable the recipient to obtain a greater percentage of debt than any other creditor of the same class.

¶3 The circuit court did not explicitly resolve the parties' disagreement regarding how WIS. STAT. § 128.07(2) should be interpreted, but it did make findings of fact and ultimately determined that Nasonville had reasonable cause to believe its receipt of the $290,000 would effect a preference. We conclude the evidence was sufficient to support the court's conclusion that the payment at issue constituted a voidable preference. Specifically, there was sufficient evidence upon which the court could reasonably determine that Nasonville had reasonable cause to believe at the time of the payment both that Liberty was insolvent and that

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

receipt of the payment would allow Nasonville to obtain a greater percentage of its debt than other general unsecured creditors. We therefore affirm.

## BACKGROUND

¶4 The basic facts in this case are undisputed. To properly understand the legal claims and arguments at issue in this appeal, a fairly detailed recitation of the nature and history of the transactions between Liberty and Nasonville, as well as of other facts, is required.

¶5 Liberty was a milk contractor that acted as a producer agent, buying milk from dairy farmers and then supplying that milk to customers. As a producer agent, Liberty was licensed and regulated by the Wisconsin Department of Agriculture, Trade and Consumer Protection (DATCP), which conducted periodic reviews to ensure that Liberty's producers were being paid. Liberty sold the milk from its producers to cheesemakers like Nasonville and other dairy plants.

¶6 In the summer of 2011, Nasonville's general manager, Kenneth Heiman, made a $100,000 personal loan to Kevin Dickinsen, who was the principal of Liberty.[2] The loan was apparently designed to forestall Dickinsen's home from being foreclosed upon. Heiman expected relatively prompt repayment of the loan (i.e., at some point in 2012), but Dickinsen told Heiman he was unable to pay him and would attempt repayment from other investments. Dickinsen never repaid the money.

---

[2] According to the parties' briefs, Dickinsen is likely deceased, although Nasonville states it has "some suspicion" that Dickinsen may have simply left the country following Liberty's collapse.

¶7    According to the exhibits admitted at trial, the business transactions involving Liberty and Nasonville for the remainder of 2011 were mostly unremarkable.  Liberty would ship milk to Nasonville and then send an invoice approximately twice per month.  The parties were dealing in significant quantities of milk, with the invoices between October and December 2011 totaling hundreds of thousands of dollars each month.[3]  Nasonville would issue checks to Liberty shortly after receiving the invoices, usually within about one week.

¶8    In January 2012, Liberty and Nasonville began engaging in a series of short-term loans, known as "milk advances."  Heiman testified that Dickinsen requested the advances because Liberty was having difficulty paying its producers while it awaited milk payments from its customers.  The milk advance transactions were structured such that Nasonville would make a loan to Liberty, which Liberty would then repay once it had received payments from its customers.  In some instances, Liberty assigned the receivable item to Nasonville, and Liberty's customers paid Nasonville directly for milk they had purchased from Liberty.

¶9    For example, the first substantial milk advance appears to have occurred on January 9, 2012.  On that date, Nasonville loaned Liberty $500,000.  Approximately one week later, Liberty invoiced its various customers for milk deliveries and assigned those receivables to Nasonville.  Cheryl Aumann, Nasonville's accountant, testified the advance was repaid as Nasonville received the checks from Liberty's customers.  Nasonville continued making lump-sum

---

[3] For example, in December 2011, Liberty sent two invoices to Nasonville, one for approximately $500,000 on December 15 and another for approximately $575,000 on December 31.

advances directly to Liberty between January and June 2012. Generally speaking, the transactions during that time resulted in a zero balance between Liberty and Nasonville, as Nasonville received payments directly from Liberty's customers, including itself, in the amount of the advances.

¶10 The milk advances continued for the remainder of 2012 until Liberty's collapse in late 2014. By mid-2013, Liberty was taking on increasing amounts of debt to Nasonville; Nasonville's attorney acknowledged there were "six figure arrears for pretty much the entire year of 2013." During April 2013, for example, Liberty's account had a positive balance only once, and at one point Liberty owed Nasonville over $550,000. For the remainder of the year, Liberty was always in debt to Nasonville in varying amounts between approximately $34,000 and $795,000.

¶11 Liberty was able to become current on the advances at various points in 2014, but it frequently owed Nasonville hundreds of thousands of dollars, including $860,321.69 on February 17, 2014. On November 30, 2014 (what was to become a significant date related to the receivership action), Liberty entered the day owing Nasonville approximately $560,000. After Liberty invoiced two customers (one of them Nasonville) for milk sales, Liberty's debt to Nasonville on the milk advances stood at $16,832.35.

¶12 When asked at trial about the significant amounts Liberty owed Nasonville, Aumann agreed Nasonville was extending more credit than was necessary for the milk advances, including as of November 30, 2014. Aumann, referencing a spreadsheet accounting of all milk advances and receivable assignments between the parties, agreed the approximately $16,800 loan balance as of November 30 had been discounted for an outstanding invoice to a Liberty

customer in an amount of more than $425,000. Because Nasonville had not yet been paid for that invoice, Liberty's actual indebtedness to Nasonville at the time was approximately $443,000.

¶13    Nasonville also made loans to entities associated with Dickinsen, which the parties refer to as the "Plowshare loans." The Plowshare loans were issued between February 2012 and November 2014 in an aggregate amount of $405,000. The loans were, at least in part, intended to help Liberty pay its dairy farmers, but the loans were not issued directly to Liberty. Nonetheless, both Aumann and Heiman testified at trial that they believed at the time of the relevant transactions that Liberty owed or would be repaying the Plowshare debt.[4] The Plowshare loans were secured by a mortgage on real property owned by one of Dickinsen's other entities, which was located in the Town of Bridge Creek, Wisconsin. The Plowshare Loans were not repaid.

¶14    Beginning in January 2014, Nasonville began making another form of short-term loans to Liberty, known as "check swaps." In such transactions, Liberty and Nasonville would exchange checks for an identical amount. Liberty would cash the Nasonville check immediately, while Nasonville would hold Liberty's check until Dickinsen told Nasonville sufficient funds were available, usually a period of days or a few weeks. Dickinsen explained that these transactions were necessary because certain customers had changed their pay schedules and those customers' checks were not arriving before Liberty had to pay its producers. In 2014, these transactions occurred alongside the milk advances.

---

[4] Indeed, Nasonville included the Plowshare loans in its creditor claim against Liberty.

¶15    The final check swap occurred on November 24, 2014, in the amount of $290,000. Nasonville cashed Liberty's check on November 30, 2014. The check cleared; indeed, none of Liberty's checks to Nasonville were returned for insufficient funds. However, in mid-December 2014, Liberty's producers began contacting the DATCP with complaints that Liberty's checks were bouncing. The DATCP had conducted a compliance audit of Liberty in November 2014, but it was unaware of the check swaps at that time and had every indication that Liberty's producers were being timely paid.

¶16    On December 18, 2014, Liberty's field representative, Thomas Olson, began informing farmers that Liberty was going into default and they would not be receiving a milk check. Shortly thereafter, Liberty acknowledged it was insolvent and filed an assignment for the benefit of its creditors in the Chippewa County Circuit Court. The circuit court subsequently appointed attorney Daniel Freund as receiver. Nasonville filed a claim in the receivership proceedings for a total of approximately $465,000, which included the remaining amount due on the milk advances as well as the Plowshare loans.

¶17    In 2016, Freund filed a complaint against Nasonville alleging, as relevant here, that Liberty was not liable for the Plowshare loans and that Nasonville's receipt of the $290,000 check swap payment on November 30, 2014, constituted a voidable preference under WIS. STAT. § 128.07(2). Accordingly, the receiver sought a judgment requiring Nasonville to disgorge the $290,000 for the benefit of all of Liberty's creditors. The parties stipulated to allow Nasonville's claim to proceed as a general unsecured claim in the amount of approximately $41,000, while the circuit court set a bench trial on the receiver's preference claim.

¶18    Prior to trial, the parties notified the circuit court about a disagreement over the correct interpretation of WIS. STAT. § 128.07(2).  Under that subsection, a preference is voidable if, among other things, "the recipient has reasonable cause to believe that the enforcement of the judgment or transfer would effect a preference." *Id.*  The parties disputed the meaning of that phrase, with Freund arguing the statutory language meant he only had to prove Nasonville had reasonable cause to believe that Liberty was insolvent at the time it received the $290,000 payment.   Nasonville, on the other hand, argued there were two necessary components: knowledge of insolvency *and* knowledge of preferential treatment.   Nasonville contested whether it had reasonable cause to believe both that Liberty was insolvent and that the payment at issue would enable Nasonville to obtain a greater share of its debt than Liberty's other creditors in the same class.[5]

¶19    At trial, Nasonville stipulated to most of the elements necessary for the receiver to prove a voidable preference existed.  However, Nasonville disputed "the knowledge of insolvency and knowledge of the fact that receipt of the payment would effect a preference."  After the evidentiary phase of the trial had been completed, the parties again raised the legal issue regarding the correct interpretation of WIS. STAT. § 128.07(2) in their closing arguments.  The circuit court granted judgment for Freund in an oral decision immediately following the arguments, but it did not offer a specific resolution of the parties' dispute concerning the correct interpretation of § 128.07.

---

[5] It is undisputed that Liberty's $290,000 indebtedness to Nasonville was a general unsecured debt.

¶20    Rather, the circuit court made certain findings of fact, which it then stated were sufficient to "put an ordinarily prudent [person] on notice … that this check was a preference." Specifically, the court found that Nasonville knew Liberty was having significant cash flow problems, causing it to engage in unusual business transactions with Nasonville. With respect to the milk advances, the court concluded such transactions should have raised concerns because the money advanced was in amounts larger than Liberty's sales.

¶21    Additionally, the circuit court found that despite Dickinsen's explanation that the check swaps were necessary for Liberty to meet its twice-monthly obligations to its producers, the check swaps were occurring much more frequently, including seven swaps in October 2014. Finally, the court found that Nasonville viewed and treated Liberty and Dickinsen's other entities as interchangeable, and that Dickinsen was known to be in a poor financial condition based upon his failure to repay the Plowshare loans or Heiman's personal loan to him. The court found this conduct, in its totality, evidenced a "scheme" to evade DATCP scrutiny, and the court remarked that it suspected the check swaps were arranged "from the very outset with the expectation" that Nasonville wanted to ensure its funds were repaid once the business collapsed.

¶22    Following the circuit court's oral decision, it entered a judgment allowing Freund to recover $290,000 plus costs and interest from Nasonville. Nasonville now appeals.

## DISCUSSION

¶23    Nasonville contends the circuit court erred as a matter of law by concluding that there were sufficient facts to put an ordinarily prudent business person on notice that the $290,000 payment at issue constituted a preference.

9

Nasonville's argument in this regard is twofold. First, it asserts WIS. STAT. § 128.07(2) dictates that a transfer is voidable only if the receiver shows the recipient had reasonable cause to believe at the time of the transfer both that the debtor was insolvent and that enforcing the transfer would enable the creditor to obtain a greater share of its debt than other creditors of the same class. Second, assuming this to be the correct legal standard, Nasonville argues there was insufficient evidence to support findings that it had reasonable cause to believe either that Liberty was insolvent or that accepting the $290,000 payment in November 2014 would place Nasonville in a preferential position as compared to any of Liberty's other general unsecured creditors.

## I. Interpretation of WIS. STAT. § 128.07(2)

¶24    Our first task is to determine the proper interpretation of WIS. STAT. § 128.07(2). Statutory interpretation presents a question of law, which we review de novo. *League of Women Voters of Wis. v. Evers*, 2019 WI 75, ¶13, 387 Wis. 2d 511, 929 N.W.2d 209. The purpose of statutory interpretation is to discern the legislature's intent. *Otterstatter v. City of Watertown*, 2017 WI App 76, ¶20, 378 Wis. 2d 697, 904 N.W.2d 396. We begin with a statute's plain language, which we give its common, ordinary and accepted meaning, except technical or specially defined words will be given those respective meanings. *Id.* Further, we interpret statutory language in the context in which it is used, in relation to the language of surrounding or closely related statutes, and in a reasonable manner to avoid absurd or unreasonable results. *Id.*

¶25    The law favors the equal distribution of assets when creditors cannot be fully paid. *Goetz v. Zeif*, 181 Wis. 628, 641, 195 N.W. 874 (1923); *see also* WIS. STAT. § 128.11. This policy is embedded in WIS. STAT. § 128.07, which

allows a receiver, under certain conditions, to recover preferential payments made by a debtor while insolvent. "The very word 'preference' means that one person is favored above others, who before the favor was shown stood on equal footing." ***Claridge v. Evans***, 137 Wis. 218, 226, 118 N.W. 198 (1908). The statute seeks to prevent a single creditor from diminishing the debtor's assets, to the detriment of other creditors of the same class. ***Id.*** at 225.

¶26 There are two statutory provisions relevant to the action to recover the payment at issue in this case. The first, WIS. STAT. § 128.07(1)(a), defines what constitutes a preference:

> A person shall be considered to have given a preference if, being insolvent, the person has made a transfer of any of his or her property, or has procured or permitted a judgment to be entered against him or her in favor of any other person, and the effect of the transfer or the enforcement of the judgment will be to enable any other creditor to obtain a greater percentage of his or her debt than any other creditor of the same class.

As relevant here, this paragraph defines a preference as: (1) a transfer of property (2) made by an insolvent debtor (3) the effect of which is to allow the recipient creditor to obtain a greater percentage of his or her debt than other creditors of the same class. The receiver bears the burden of proving the elements of a preference. *See* ***Estate of Boyle v. McGalloway***, 223 Wis. 39, 41, 269 N.W. 533 (1936).

¶27 The parties stipulated that a preference existed in this case. Specifically, Nasonville conceded that it had received the $290,000 from Liberty; that Liberty was insolvent at the time Nasonville received those funds; and that, in fact, the $290,000 payment allowed Nasonville to recover a greater share of its debt than Liberty's other general unsecured creditors.

11

¶28    The second relevant statutory provision is W<small>IS</small>. S<small>TAT</small>. § 128.07(2), which dictates the circumstances under which a particular preference is voidable. A preference is voidable, and the property or its value may be recovered from the recipient, if the preference occurs within four months before the filing of a petition for the appointment of a receiver and "the recipient has reasonable cause to believe that the enforcement of the judgment or transfer would effect a preference." *Id.* There is no dispute that the $290,000 transfer in this case occurred within four months of the petition's filing.

¶29    The primary legal question in this case is thus whether the recipient's knowledge that a payment would "effect a preference" has one or two parts. The parties agree that W<small>IS</small>. S<small>TAT</small>. § 128.07(2) requires the receiver to prove that the creditor had reasonable cause to believe the debtor was insolvent at the time of the transfer. Again, Nasonville argues there is an additional requirement—namely, that the creditor also must have had reasonable cause to believe that the transfer would allow the creditor to obtain a greater share of his or her debt than other creditors of the same class. In Nasonville's view, not only is such an interpretation supported by the statute's plain language, but other courts construing the Bankruptcy Act of 1898 or analogous state laws have reached similar conclusions.[6]

---

[6] W<small>ISCONSIN</small> S<small>TAT</small>. § 128.07 was enacted in 1937 and was in large measure based upon the federal Bankruptcy Act of 1898. *In re Bossell, Van Vechten & Chapman*, 30 Wis. 2d 20, 26-27, 139 N.W.2d 639 (1966). Accordingly, cases interpreting similar provisions in the bankruptcy statutes may inform our interpretation of § 128.07. *In re Bossell*, 30 Wis. 2d at 26.

(continued)

12

¶30     We agree with Nasonville, based upon a plain-language reading of WIS. STAT. § 128.07(2).  That subsection directs that a preference is voidable if at the time of a transfer the recipient had reasonable cause to believe the transfer "would effect a preference."  *Id.*  The meaning of the phrase "effect a preference" must refer to § 128.07(1)(a), which defines the giving of a preference.  Under the language in para. (1)(a), a preference is not established merely by the debtor's insolvency.  It is also necessary to establish that a transfer of property occurred and had the effect of allowing a creditor to recover more than his or her fair share of debt when compared to other creditors of the same class.

¶31     Accordingly, we conclude the proper interpretation of WIS. STAT. § 128.07(2) conditions voidability of a transfer upon the creditor's basis to believe two things.  First, the creditor must have had reasonable cause to believe the debtor was insolvent at the time of the transfer.  Second, the creditor must have had reasonable cause to believe the transfer would put him or her in a preferential position—i.e., the transfer would enable the recipient "to obtain a greater percentage of his or her debt than any other creditor of the same class."  *See* § 128.07(1)(a).  This interpretation appears to have been the one given to a similar

---

The bankruptcy cases Nasonville cites in support of its interpretation are: ***Whitmore v. Swank***, 252 F. 135, 135 (4th Cir. 1918) (observing it was "purely a question of fact" whether the creditor had reasonable cause to believe that the debtor was insolvent and that the conveyance would effect a preference); ***Sterrett v. White Pine Sash Co.***, 30 P.2d 665, 666 (Wash. 1934) (faulting the lower court for making no finding that at the time of the payments at issue the creditor had reasonable cause to believe that the debtor was insolvent and that the payments would effect a preference); and ***Homan v. Hirsch***, 211 P. 795, 797 (Or. 1922) ("In such litigation each case must depend upon its own circumstances, because the principal dispute is about the question of fact involved, to wit, whether or not the creditor had reasonable cause to believe that the debtor was insolvent and that the transfer would operate as a preference.").

statute in the context of a bankruptcy action. *See Schwemer v. Milwaukee Commercial Bank*, 185 Wis. 243, 250, 201 N.W. 398 (1924).

¶32　Freund does not truly argue that such an interpretation is incorrect. Although he asserted to the circuit court that he needed merely to show that Nasonville had reasonable cause to believe Liberty was insolvent, on appeal Freund does not discuss or even cite the primary case on which he relied below.[7] Rather, citing only *Goetz*, Freund summarily contends that a number of factors are relevant to determining whether a creditor had reasonable cause to believe that a particular transfer would effect a preference.

¶33　The bankruptcy controversy in *Goetz* concerned a series of assignments of company assets to one of the company's creditors while the company was in a dire financial condition. *Goetz*, 181 Wis. at 631-37. The creditor argued there was no evidence establishing he had reasonable cause to believe the assignments would effect a preference. In rejecting this argument, our supreme court held that to prove a creditor had such a reasonable belief, there need not be direct evidence that the creditor knew of the company's financial condition (such as by proof of direct statements made to the creditor or proof that the creditor examined the company's books). *Id.* at 638. Circumstantial evidence can suffice.

---

[7] Before the circuit court, Freund asserted that *Roys v. First National Bank*, 183 Wis. 10, 197 N.W. 237 (1924), had definitively interpreted WIS. STAT. § 128.07 to make a preference voidable if the receiver merely presented proof that the creditor had reasonable cause to believe the debtor was insolvent at the time of the transfer. Although Freund does not raise this argument on appeal, we disagree with any assertion that *Roys* reached the question of how the statute should be interpreted. Rather, our supreme court merely held that the jury instructions given in that case were "obviously erroneous" because they were "argumentative" and recited only one side of the evidence. *Id.* at 18.

¶34     Although the *Goetz* court was presented with an evidentiary issue and was not asked to define what it means to have reasonable cause to believe that a transfer effects a preference, we agree with Freund that the court's discussion of the types of evidence that would make a satisfactory circumstantial showing of such knowledge remains highly relevant.  We therefore adopt *Goetz*'s articulation of what circumstantial factors may support a finding, under WIS. STAT. § 128.07(2), that a creditor had "reasonable cause to believe" both that a debtor was insolvent and that a particular transfer to the creditor would permit the creditor to recover more of his or her debt than other creditors of the same class.[8]

¶35     Specifically, such reasonable cause "may be established by proof of knowledge of such facts as would lead an ordinarily prudent business [person] to believe the transfer would effect a preference." *Goetz*, 181 Wis. at 639.  The fact finder may consider circumstantial evidence giving rise to an inference that an ordinarily prudent business person would have formed such a belief. *Id.*  Facts relevant to such a determination can include: (1) the relation of the parties; (2) their intimacy or lack of it; (3) the usual or unusual nature of the transfer; (4) the opportunities of the creditor for knowledge; (5) the participation of the creditor, if any, in the debtor's business; and (6) the credibility and forthrightness of the witnesses as to the disclosure of relevant facts within their knowledge. *Id.*

¶36     The *Goetz* factors appear relevant to both prongs of the WIS. STAT. § 128.07(2) inquiry.  For example, the relation of the parties and the intimacy of

---

[8] Consistent with our holding herein regarding the requirements of WIS. STAT. § 128.07(2), the circuit court in *Goetz v. Zeif*, 181 Wis. 628, 195 N.W. 874 (1923), specifically found that the "defendant had good reason to believe, when receiving these transfers, that he was receiving a greater percentage of his indebtedness than other unsecured creditors." *Id.* at 637.

their business transactions might give rise to reasonable cause to believe both that the debtor is insolvent and that, by receiving a particular payment, the creditor will be disadvantaging other similarly situated creditors. Nonetheless, although there may be some overlap in the nature of the evidence that might be used to establish the subsec. (2) criteria, they are distinct standards that must be satisfied.

¶37     Having concluded that WIS. STAT. § 128.07(2) required the receiver to establish that Nasonville had reasonable cause to believe both that Liberty was insolvent and that the transfer would enable Nasonville to collect more than its fair share of Liberty's debt, we now turn to whether the evidence was sufficient to support the circuit court's determination that Nasonville's receipt of the $290,000 payment on November 30, 2014, constituted a voidable preference.

## II.   *Sufficiency of the Evidence*

¶38     Before reviewing the evidence to support the circuit court's determination, we must pause momentarily to address a secondary issue. Nasonville faults the court for failing to resolve the dispute regarding the proper interpretation of WIS. STAT. § 128.07(2) and to make specific factual findings on that issue. However, considering the parties' significant development of the issue before the court, and taking into account the court's comments during its oral decision, we conclude the court implicitly determined Nasonville had reasonable cause to believe the transfer placed it in a preferential position as against other general unsecured creditors.

¶39     The parties' dispute as to the meaning of WIS. STAT. § 128.07(2) was raised repeatedly in the circuit court, in both the parties' pretrial memoranda and again during closing arguments at trial. The court was certainly aware of the parties' disagreement, and although it did not purport to explicitly resolve that

disagreement, it nonetheless stated in its ultimate conclusion that the evidence was sufficient to "put an ordinarily prudent [person] on notice … that this check was a preference." "[W]hen the record does not include a specific finding on an issue, this court will assume that the issue was resolved by the trial court in a manner which supports the final judgment or order." *State v. Berggren*, 2009 WI App 82, ¶18, 320 Wis. 2d 209, 769 N.W.2d 110. Additionally, when a circuit court fails to make express findings of fact necessary to support its legal conclusion, we assume the court made such findings in a way that supports its decision. *State v. Long*, 190 Wis. 2d 386, 398, 526 N.W.2d 826 (Ct. App. 1994).

¶40 In any event, the sufficiency of the evidence is a question of law, which we review de novo. *Lemke v. Lemke*, 2012 WI App 96, ¶28, 343 Wis. 2d 748, 820 N.W.2d 470. If the record lacked sufficient evidence to support the circuit court's conclusion, including on the second prong of WIS. STAT. § 128.07(2), our independent review of the record would discover that insufficiency.

¶41 We will not set aside a circuit court's findings of fact unless they are clearly erroneous, and we must give "due regard … to the opportunity of the trial court to judge the credibility of the witnesses." WIS. STAT. § 805.17(2). Moreover, where only one reasonable inference can be drawn from the evidence, the drawing of that inference is a question of law. *Welytok v. Ziolkowski*, 2008 WI App 67, ¶26, 312 Wis. 2d 435, 752 N.W.2d 359. If more than one reasonable inference can be drawn, we accept the inference drawn by the circuit court sitting as fact finder. *Id.*, ¶27.

¶42 In addressing Nasonville's arguments, we must be mindful of the nature of its assertions here. The matter here is not one of merely applying a

17

particular set of facts to determine whether it satisfies a statutory standard. Rather, whether the recipient of a payment had reasonable cause to believe the debtor was insolvent and the transfer would effect a preference are questions of ultimate fact. *See **Whitmore v. Swank***, 252 F. 135, 135 (4th Cir. 1918); ***In re Eggert***, 102 F. 735, 742-43 (7th Cir. 1900) (observing that the questions of what a person has reasonable cause to believe, and what an ordinarily prudent business person would have done under given circumstances, are questions of fact to be resolved by the jury); ***Homan v. Hirsch***, 211 P. 795, 797 (Or. 1922) (noting the principal dispute was about "the question of fact" of whether the creditor had reasonable cause to believe the debtor was insolvent and the transfer would operate as a preference); *see also **Walber v. Walber***, 40 Wis. 2d 313, 319, 161 N.W.2d 898 (1968) (defining an ultimate fact as a fact upon which a judgment rests). The historical facts, as found by the circuit court, are what inform this determination, and Nasonville does not directly challenge any of those facts as clearly erroneous. Our task is to ascertain whether there was a valid evidentiary basis upon which the circuit court could make its findings of ultimate fact.[9]

A. *Evidence Supporting the Court's Finding that Nasonville Had "Reasonable Cause To Believe" Liberty was Insolvent*

¶43 We first analyze whether the evidence was sufficient to support the circuit court's determination that Nasonville had reasonable cause to believe Liberty was insolvent at the time it deposited the $290,000 check. As relevant

---

[9] Indeed, at trial, Freund tendered a witness whom he sought to have qualified as an expert to offer an opinion regarding ordinarily prudent business practices. Nasonville objected on the basis that the determination of what an ordinarily prudent business person had reasonable cause to believe was "an ultimate fact issue that's for the finder of fact." Thus, it appears undisputed that our review is of a factual, not legal, determination.

here, a person is insolvent when the aggregate fair value of a person's property is insufficient to pay the person's debts. WIS. STAT. § 128.001(1)(a).[10]  A mere inability to pay debts as they accrue does not constitute insolvency, but evidence of a sustained inability to pay is relevant. *Schwemer*, 185 Wis. at 249.  "Such inability to pay debts in the ordinary course of business, long continued, is apt to accompany insufficiency of assets." *Id.*

¶44    Nasonville principally argues that its knowledge regarding the Plowshare loans—which, again, were loans Dickinsen had acknowledged he could not pay and which remained outstanding for a significant period of time—should not have factored into the calculus because those loans were not debt owed by Liberty.  Regardless, the evidence at trial established that Heiman was involved in the Plowshare transactions and believed the loans both were intended to help Liberty pay its dairy farmers and were a debt of Liberty's, even though the loans were not issued directly to Liberty.  Nasonville offers no compelling reason why such a contemporaneous belief on the part of its manager and other company officials—erroneous or not—cannot factor into a determination regarding whether it had reasonable cause to believe payments to it were effecting a preference.

¶45    In addition to Nasonville's knowledge that some of the money was intended for Liberty's benefit, there were other indicia related to the Plowshare loans that would have caused an ordinarily prudent business person to believe Liberty was on fragile financial footing.  The collateral Dickinsen ultimately

---

[10] A person is also deemed insolvent by statute when an execution against his or her property is returned unsatisfied, or when the person makes an assignment for the benefit of creditors. WIS. STAT. § 128.001(1)(b), (c).

19

offered to secure those loans was not Liberty's asset, which was evidence that tended to show that Liberty did not have sufficient assets to secure a loan intended for its benefit. Finally, it is undisputed both that Dickinsen was the principal for all of the entities to which Nasonville lent money, and that Nasonville and Heiman knew of the interrelatedness of all the debtor entities—including that some of the money lent to other entities was to be funneled to Liberty, and Dickinsen was unable to repay those debts. Under these circumstances, the evidence regarding the Plowshare loans was relevant to a determination of whether an ordinarily prudent business person would have had reasonable cause to believe that Liberty was insolvent.[11]

¶46     Nasonville emphasizes Heiman's testimony that Dickinsen never told him Liberty was insolvent, nor did Heiman inspect Liberty's books and records. As previously discussed, such direct evidence is not necessary to prove that a creditor had reasonable cause to believe the debtor was insolvent. *See Goetz*, 181 Wis. at 639. Among other things, a creditor's reasonable cause to believe a debtor is insolvent may be established by facts concerning the parties' relationship, the nature of the transfer, the creditor's opportunities to gain knowledge of the debtor's business, and the participation of the creditor in the debtor's business. *Id.*

¶47     Here, there was sufficient evidence to support the circuit court's determination that an ordinarily prudent business person would have had

---

[11] In any event, Freund argues that even without the Plowshare loans, there was sufficient evidence to support the circuit court's determination that an ordinarily prudent business person would have had reasonable cause to believe Liberty was insolvent. For the reasons stated elsewhere in this section of the opinion, we agree.

reasonable cause to believe Liberty was insolvent. It is undisputed that, throughout 2013 and 2014, Liberty was at times heavily indebted to Nasonville. The amount of the indebtedness was frequently hundreds of thousands of dollars, and Nasonville was aware it was advancing more cash than was supported by Liberty's ongoing milk sales. After the November 30, 2014 deposit, Liberty remained indebted to Nasonville in the amount of approximately $17,000, even after earlier that day having assigned to Nasonville an approximately $426,000 receivable from another customer.

¶48    Moreover, as time went on, the significant sums Nasonville was advancing were insufficient to allow Liberty to timely pay its debts. As a result, Dickinsen requested in 2014 that Liberty and Nasonville also engage in a series of check swaps. At the time of the first check swap, on January 28, 2014, Liberty already owed Nasonville approximately $769,000. Although Liberty was able to bring its debt with Nasonville current at a few points in 2014, such positive balances lasted only a few days or less before Liberty was again deeply in debt.[12] The check swaps continued throughout this time, in various amounts between $80,000 and $290,000. On November 24, 2014 (the date of the final check swap), Liberty owed Nasonville approximately $560,000. The circuit court could reasonably conclude from all of this evidence that an ordinarily prudent business person would have inquired further into the need for the check swaps given the

---

[12] We note that some of the transactions listed on the spreadsheet of milk advances are not in chronological order. For example, on April 10, 2014, Nasonville advanced $180,000 to Liberty, yet this transaction was not recorded until after Nasonville had been assigned a series of receivables on April 15. In this instance, and possibly others, the manner of accounting gives the appearance of a considerable positive balance, when in fact one did not exist or would have been considerably less.

21

substantial existing indebtedness and the concurrent, continuing practice of making substantial milk advances.

¶49 Further, there was evidence that the check swaps were highly unusual business transactions in the industry. A DATCP representative testified he had never seen a dairy use check swaps to ensure that producers were being paid. The circuit court's finding that the check swaps were designed to avoid regulatory scrutiny was supported by the representative's testimony that the check swaps prevented "red flags" that would have prompted the agency's further inquiry, as DATCP was unaware Liberty was having difficulty paying its producers and only saw that producers were being paid on time. Freund's expert witness testified that check swaps are a "fine" source of quick short-term cash for businesses, as long as they occur very rarely, no more than "once or twice a year." She testified that "when it becomes multiple checks, it's just an indication that there [are] a lot of problems happening."

¶50 Additionally, there was evidence that Dickinsen's proffered reason for requesting the check swaps was suspect. At all relevant times, milk contractors were required by law to pay their producers twice a month, on the 4th and the 19th. The check swaps never aligned with those dates, including the exchange at issue here, which occurred five days after November 19th and ten days before the next payment was due on December 4th. Even if one could view the swaps as being made in anticipation of Liberty's obligations on the latter date, this view does not explain why in some months there were more than two check swaps, including seven in October alone. This evidence supported the circuit court's conclusion that an ordinarily prudent business person would have further investigated Liberty's solvency before making additional loans.

¶51 "[I]f facts and circumstances with respect to the debtor's financial condition are brought home [to the creditor], such as would put an ordinarily prudent [person] upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose." *In re Eggert*, 102 F. at 741. Here, Nasonville does not make any argument that further inquiry by it would not have revealed that Liberty was insolvent as of November 30, 2014. At trial, Freund offered the testimony of an accountant who stated that a review of Liberty's accounting data alone would have revealed that Liberty was in an "absolutely terrible" financial condition. Upon further investigation, the accountant discovered that Liberty had checking accounts that were consistently overdrawn in significant amounts; that it was not filing its payroll taxes and had been assessed interest and penalties by the Internal Revenue Service; that at all times after June 2012, Liberty had already spent the money intended to be paid to its dairy farmers and haulers before those parties had been paid; and that Liberty had virtually no other assets. In all, the accountant concluded Liberty had been insolvent from June 30, 2012, until its collapse.

¶52 Nasonville portrays the evidence as showing a long-term pattern of typical business practices between the parties. Nasonville finds it significant that each of Liberty's checks, including the last one, cleared when they were deposited. Additionally, Nasonville points out that Liberty's dairy farmers were paid in full through November 2014, and that DATCP failed to detect any problems with Liberty's business in a contemporaneous audit. These arguments are merely an attempt to relitigate the case and ignore the applicable standard of review. The circuit court's findings adequately explain why such evidence was not compelling, and there is sufficient evidence to support the findings it did make. Even though the check swap at issue was of short duration, this fact presents no defense to a

preference claim when the payment of the debt occurred while the creditor had reason to believe the debtor was insolvent. *See Goetz*, 181 Wis. at 641. Moreover, even if the check swaps could be characterized as a typical business transaction between these parties, the fact that the earlier check swaps were not actionable merely because Liberty's producers were being paid during those periods does not absolve Nasonville of liability for the relevant time—namely, when those producer payments ceased.

B. *Evidence Supporting the Court's Finding that Nasonville Had "Reasonable Cause To Believe" Its Receipt of the $290,000 Would Effect a Preference*

¶53    Next, Nasonville asserts the receiver presented "no evidence whatsoever to show that Nasonville had reasonable cause to believe its receipt of the $290,000.00 payment from Liberty on November 30, 2014, would enable Nasonville to obtain a greater share of its debt than other general unsecured creditors." Nasonville specifically argues there was no evidence at trial regarding the state of Liberty's other creditors except Liberty's producers, and they were paid until mid-December 2014. Nasonville appears to imply that because there were no debts established as of November 30, 2014, to anyone other than Nasonville, Freund failed to meet his burden of proof.

¶54    Nasonville's argument does not comport with either the applicable legal standard or the reasonable inferences from the evidence that the circuit court both implicitly and explicitly drew. Regarding the legal standard, as with the question of insolvency, actual knowledge is not required. "Reasonable cause to believe" means knowledge of such facts as to induce a reasonable belief as opposed to a mere suspicion. *Canright v. General Fin. Corp.*, 123 F.2d 98, 99 (7th Cir. 1941). The receiver does not have to prove that the creditor knew, at the

24

time of the allegedly preferential payment, what result would obtain if all of the debtor's assets had been liquidated and distributed among the creditors. *Id.* at 100. Rather, we focus on the "realities of the situation" in determining whether there was sufficient evidence to support a finding that Nasonville had reasonable cause to believe that its receipt of the $290,000 would place it in a more advantageous position than the remainder of Liberty's similarly situated creditors. *See id.*

¶55    As to the evidence, Heiman testified he was aware Liberty was having difficulty paying its producers, which is why Nasonville began making the milk advances.  Nasonville had actual knowledge that those amounts were advanced for the purposes of paying dairy farmers for the milk they were producing and selling to Liberty.  Relatedly, Nasonville knew firsthand the significant amount of money Liberty owed to its various producers.  Given the circuit court's finding that Nasonville had reasonable cause to believe Liberty was insolvent at the time of the $290,000 payment, it was also reasonable to conclude Nasonville was aware of the existence of another class of creditors that would be adversely affected by the payment of the debt.

¶56    Based upon the evidence adduced at trial, the fact finder could reasonably infer that Nasonville was uncomfortable with the significant amounts of debt Liberty owed on the milk advances throughout 2013 and was concerned about its ability to collect that debt.  Accordingly, at the beginning of 2014, Nasonville and Liberty began the check swaps, which had a shorter duration and, therefore, better protected Nasonville.  Indeed, the improvements in the amount of Liberty's indebtedness to Nasonville for the milk advances during the 2014 calendar year coincide with the inception of the check swaps.  All of this led the circuit court to remark that it suspected the check swaps occurred "from the very onset with the expectation that when this is caught [presumably by DATCP], I

want my money out of it." This conclusion that Nasonville considered itself better protected by the check swaps in the event of Liberty's collapse is quite reasonable under the facts in this case.

¶57     Nasonville also had reasonable cause to believe it was in a better position than other similarly situated creditors because it had received a check for its debt that could be used to receive immediate funds, rather than merely being left with a claim for whatever assets were left along with other creditors. Regardless of whether Nasonville had actual knowledge of Liberty's indebtedness to any other party, there was sufficient evidence for a fact finder to infer that an ordinarily prudent business person would have reasonable cause to believe that the $290,000 payment would place Nasonville in a more preferential position than any other similarly situated creditor, including Liberty's dairy farmers.

*By the Court.*—Judgment affirmed.