COURT OF APPEALS
DECISION
DATED AND FILED

March 12, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP625**

**STATE OF WISCONSIN**

Cir. Ct. No. **2021SC249**

**IN COURT OF APPEALS
DISTRICT III**

TRAVIS R. LAYHER,

    PLAINTIFF-RESPONDENT,

V.

PATRICIA A. HOFFMAN,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Shawano County: KATHERINE SLOMA, Judge. *Affirmed*.

¶1 HRUZ, J.[1] Patricia Hoffman, pro se, appeals from a judgment awarding $7,333.80 to Travis Layher and ordering Layher to return a vehicle to Hoffman at Hoffman's expense. Hoffman argues that we should reverse the

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

judgment because: (1) the circuit court erred by sequestering her husband, John Hoffman, from the courtroom at trial; (2) the court failed to adequately address Hoffman's amended response and counterclaim; (3) the court erred by awarding damages on equitable grounds after Layher failed to prove either a breach of contract or a breach of warranty; (4) Layher's attorney violated multiple Wisconsin Supreme Court Rules; and (5) there were "discrepancies" in the court's oral ruling. We reject Hoffman's arguments and affirm.

## BACKGROUND

¶2      This case arises from a private motor vehicle sale. In April 2021, Layher purchased a used truck that was titled in Hoffman's name from Hoffman's minor son, Jack Hoffman.[2] The day after the sale, the truck's engine seized and would not start. Layher subsequently commenced the instant small claims lawsuit against Hoffman. He later filed an amended complaint asserting claims for breach of contract, breach of warranty, a violation of WIS. STAT. § 100.18, civil theft, and promissory estoppel. Hoffman filed an "Amended Response and Counterclaim," which asserted counterclaims against Layher for breach of contract, violations of § 100.18, and civil theft. Layher moved to dismiss Hoffman's counterclaims for failure to state a claim on which relief could be granted.

¶3      The circuit court held a two-day bench trial, beginning in September 2021 and concluding in March 2022. At trial, Logan Mitchell testified that he had purchased the truck—a Ford F-250—in approximately September 2020. After purchasing the truck, Mitchell learned that the truck's

---

[2] Throughout the remainder of this opinion, we refer to Patricia Hoffman as "Hoffman." We refer to Hoffman's husband, John, and her son, Jack, by their first names.

diesel motor was not original and had been installed in place of a prior gas engine. Mitchell testified that while he owned the truck, it burned some oil and also leaked oil onto his driveway, and the "check engine" light would come on periodically.

¶4      Mitchell testified that after about six months, he decided to sell the truck because he needed a vehicle with better gas mileage.  He sold the truck to Jack in March 2021 for $6,000.  Mitchell could not remember whether he told Jack that the truck's engine had been replaced.  He did tell Jack that the truck "burned some oil" and left oil spots on his driveway.  Mitchell testified that Jack was aware that the truck's "check engine" light came on periodically and that the light was on when Jack test drove the truck.  Mitchell denied having any "serious problems" with the truck while he owned it.

¶5      Layher testified that he purchased the truck from Jack on April 13, 2021, after seeing an advertisement for it on Facebook Marketplace.  He went to look at the truck that morning and looked underneath the vehicle and under the hood.  Jack only allowed Layher to drive the truck up and down the driveway and would not let him drive it on the road.  Layher did not "hear anything significant" while test driving the truck, but he was only able to reach a maximum speed of fifteen to twenty miles per hour.

¶6      Layher testified that he asked Jack whether he was aware of any problems with the truck, and Jack responded, "No."  Jack told Layher "that he liked the truck.  He loved the truck.  But the only reason he was getting rid of it was because his mother said he couldn't have such a big vehicle for his first vehicle."  Layher testified that Jack did not tell him anything about an oil leak, about the truck's oil usage, or about the truck's "check engine" light coming on, nor did Jack reveal that the truck's diesel motor was not original.

¶7     Later that evening, Layher returned to Jack's residence and purchased the truck for $6,800.  Both Jack and Hoffman were present at the time of purchase.  Hoffman did not tell Layher that there were any problems with the truck.

¶8     On his way home after purchasing the truck, Layher had to stop because the truck was "smoking a lot."  He initially thought that the engine simply needed to warm up due to the cold weather.  However, when he continued his journey home and "got up to freeway speeds, the check engine light kept coming on."  Layher testified that the "check engine" light had not come on during his test drive of the truck earlier that day.  Layher also testified that after he got onto the freeway, the truck "didn't seem to be driving right," and "all of [a] sudden the power would become less and then all of [a] sudden kick back up."  Layher texted Jack about these issues on the evening of April 13 but did not receive a response.

¶9     The next morning, Layher had trouble starting the truck.  He was ultimately able to start the truck and drive it to his job site.  After Layher arrived at the job site, he intended to drive the truck to a mechanic; however, he could not get the truck to start again after reaching the job site.  Layher testified that the only maintenance he performed on the truck was changing the fuel filter, which did not "solve any problems."

¶10     Layher subsequently had the truck towed to Fox Valley Truck, and he was told "that there was oil in the fuel" and "in all the fluids."  Fox Valley Truck provided Layher with an estimate of $14,421.64 to replace the truck's existing motor with a new motor.  Through Fox Valley Truck, Layher also learned that the existing motor was not original to the truck.

¶11    Layher testified that he would not have purchased the truck if he had known that the motor was not original because "I don't know who worked on it, and I don't know how reliable it is." He also testified that he would not have purchased the truck had he known about the oil leak, the truck's excessive oil usage, or the issue regarding the "check engine" light.

¶12    Finally, Layher testified that the truck was worth nothing to him in its current state because the "motor [was] blown" and he had not been able to use it for any purpose. He submitted an estimate showing that the truck had a scrap value of $200.

¶13    On cross-examination, Layher conceded that the Facebook Marketplace advertisement for the truck did not contain any promises, guarantees, or warranties. He also conceded that he did not sign any contract or other document in order to purchase the truck, and during the verbal transaction, there was no "express warranty or guarantee." Layher testified that when he looked at the truck before purchasing it, he noticed "[s]ome oil on top of the motor," but he assumed it was "regular diesel type stuff."

¶14    Steven Rodgers, the service manager at Fox Valley Truck, testified that he had been employed in that position since 1989 and had been in the automotive repair business for forty-nine years. Rodgers testified that he generally works on gas and diesel truck engines, but he is not a "specialist" in 7.3 diesel engines like the one in Layher's truck. Rodgers explained that when his shop examined Layher's truck, they "couldn't keep it running," "[p]arts fell on the ground," "[t]here was quite a bit of oil and fuel on top of the engine," there was oil in the fuel, and there was oil or fuel in the coolant. Rodgers also testified that some of the problems with the truck's engine would "be more likely to manifest

themselves at higher speeds." Rodgers opined that the truck needed a new engine. He prepared an estimate for Layher showing that the cost to replace the engine would be $14,421.64. Rodgers conceded, however, that he would not be qualified "to take the [truck's existing] engine apart" and that there "could have been" other options to repair the engine.

¶15     Jack testified that he purchased the truck on March 16, 2021, when he was fifteen years old. The truck was titled in Hoffman's name because Jack was under eighteen. Jack testified that he was not aware when he purchased the truck that it did not have its original engine, and he did not learn otherwise at any point before selling the truck to Layher. He testified that he never experienced any problems with the truck while he owned it and that he only drove it "around the yard." According to Jack, the oil level was normal while he owned the truck, and he never noticed the truck smoking.

¶16     Jack testified that Hoffman made him sell the truck in April 2021 following an argument over the costs of owning and driving the truck. He listed the truck for sale on Facebook Marketplace and did not make any guarantees or promises about its condition. Jack testified that when Layher came to look at the truck, he let Layher drive the truck "around the yard and on the town road." At Hoffman's direction, however, Jack did not allow Layher to drive the truck on a county highway because the truck was not insured.

¶17     Jack testified that during his conversations with Layher, he never made any promises or statements regarding the quality of the truck, and he never lied to Layher about the truck. Jack testified that the truck's "check engine" light was "always flashing" because of a tuner that had been installed "to enhance fuel economy and horse power." He testified that Layher did not ask him about the

"check engine" light before purchasing the truck. Jack conceded, however, that he did not know whether the check engine light was flashing when Layher test drove the truck. He also conceded that he did not tell Layher about the issue with the "check engine" light before the sale.

¶18 Hoffman testified that she was with Jack when he decided to purchase the truck, and the prior owner did not tell them that the truck's engine had been replaced. She described the truck as Jack's "dream truck." She testified that Jack did not experience any problems with the truck during the month that it was in his possession. Although Hoffman initially agreed to Jack's purchase of the truck, she changed her mind and made him sell the truck after he insisted that she pay for the truck's fuel.

¶19 Hoffman testified that she was not present when Layher initially looked at the truck on April 13, 2021, but she was there when he returned to purchase the truck that evening. She testified that neither she nor Jack made any promises or guarantees to Layher about the truck; that she never lied to Layher about the truck; that she was not aware of Jack lying to Layher about the truck; and that neither she nor Jack failed to disclose any defects regarding the truck. She also testified that the truck had never leaked oil on her driveway.

¶20 Reed Quade, a friend of Jack's, testified that he was with Jack when Jack purchased the truck from Mitchell. Following the purchase, Quade drove the truck back to Jack's home—a distance of about forty miles—because Jack did not have his driver's license. Quade testified that he did not notice any problems with the truck during that trip.

¶21 Finally, John testified that he has experience working on and repairing diesel trucks, including trucks with 7.3 engines. He testified, however,

he never looked at the truck after Jack purchased it from Mitchell, he never sat inside the truck, and he never drove the truck. Nevertheless, John opined that Rodgers' estimate regarding the cost to repair the truck was flawed in various ways. He also testified that he spoke about the truck with Josh Kildahl, a manager at an automotive repair shop in Stevens Point. Kildahl's affidavit was introduced into evidence at trial. Kildahl concluded—without actually looking at the truck—that an O-ring on the engine needed to be replaced, which was a minor repair and would cost only $320.

¶22   After summarizing the trial testimony, the circuit court stated that a small claims court "also has to be a court of equity. I have to try and do my best to make things right, and I have to do my best to make things fair." The court then stated:

> I certainly agree that [Layher] can make his case under [WIS. STAT. §] 100.18. But the problem that I have is that, you know, I have got a teenager, a 15 year old, really in charge of selling this. Now whether that's right or wrong or appropriate, I'm not going to comment on. But that's the reality of life here today and I think [Layher] understands that.
>
> So as a result, all [Layher] really wants is his money back. He will give the truck back. He wants his cash back. He wants to rescind the deal and he says that will make him happy.
>
> I think that based upon what I have seen, heard, all exhibits I looked at today, and the law I have reviewed, I think that that's the most appropriate resolution here today.
>
> And I'm going to go along with the request of [Layher] in that regard. There has to be a benefit of the bargain that's conferred and it has to last more than 30 minutes after a sale.

¶23   The circuit court further found that there was "no way" that Layher could use the truck in its current state, and that while Layher "didn't say he wanted

a perfect truck," he "certainly expected to get a working truck." The court also found that "this wasn't a matter of changing an [O]-ring. This was a matter of dropping in a new engine."

¶24    In addition to awarding Layher damages on his WIS. STAT. § 100.18 claim, the circuit court also granted Layher's motion to dismiss Hoffman's amended counterclaims, explaining that Hoffman had presented "no evidence" at trial in support of those claims. The court subsequently entered a written judgment dismissing Hoffman's amended counterclaims and awarding Layher a total of $7,333.80 in damages, costs, and attorney fees. The judgment also required Layher to return the truck to Hoffman at a mutually agreeable time and at Hoffman's expense. Hoffman now appeals.

## DISCUSSION

### I. John's sequestration at trial

¶25    At the beginning of the first day of trial in September 2021, the circuit court ordered that all witnesses in the case would be sequestered, and it directed them to wait in the hallway. The court made an identical ruling at the beginning of the second day of trial in March 2022. Hoffman did not object on either occasion to the court sequestering the witnesses—either in general or with respect to any specific witness.

¶26    On appeal, Hoffman argues for the first time that the circuit court erred by "rul[ing] that John could not be at the table to defend his marital property interest in this case and order[ing] him to wait in the hallway." Hoffman asserts that the court's sequestration of John was contrary to "the Fourteenth Amendment

9

of the United States Constitution, which gives the right to due process and representation of John's case."

¶27 As an initial matter, we note that "a party has standing to raise constitutional issues only when his or her own rights are affected," and "[h]e or she may not vindicate the constitutional rights of a third party." *Mast v. Olsen*, 89 Wis. 2d 12, 16, 278 N.W.2d 205 (1979). Consequently, it appears that Hoffman lacks standing to assert that the circuit court violated John's constitutional rights when it ordered all witnesses to be sequestered.

¶28 Regardless, Hoffman forfeited her argument that the circuit court erred by sequestering John by failing to raise that argument in the circuit court. *See Tatera v. FMC Corp.*, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810 ("Arguments raised for the first time on appeal are generally deemed forfeited."); *State v. Van Camp*, 213 Wis. 2d 131, 144, 569 N.W.2d 577 (1997) (court of appeals may decline to address arguments raised for the first time on appeal). As noted above, Hoffman did not object on either day of trial to the court's sequestration orders. In particular, she did not argue that John should not be sequestered due to any marital property interest in the case, nor did she argue that sequestering John would violate his constitutional rights.[3] We therefore decline to address Hoffman's appellate argument that the court erred by sequestering John.

---

[3] In her reply brief, Hoffman asserts that on the first day of trial, "John objected to not being able to sit at defense table citing marital property statutes and due process. Trial Court asked if he was an attorney, then immediately ruled if not he could not defend his part of case." Notably, Hoffman does not provide any record citations in support of these assertions. Our review of the trial transcripts confirms that neither Hoffman nor John ever objected to the circuit court's sequestration orders.

## II. Hoffman's amended response and counterclaims

¶29 Hoffman next asserts that the circuit court did not adequately address her amended response and counterclaims. As discussed above, Hoffman's amended response asserted counterclaims for breach of contract, violations of WIS. STAT. § 100.18, and civil theft. Within her counterclaim for violations of § 100.18, Hoffman asserted that Layher had "failed to provide facts detailing [his] allegations"; that he "failed to conduct pre-complaint investigation in sufficient depth to make sure [his] allegations of fraud are supported by facts"; that his allegations "are frivolous and have no merit"; that he had "sidestepped" Hoffman's discovery requests; and that he had "provided no evidence or detail substantiating claim[s] of Fraud, Breach of Contract, Breach of Warranty, Civil Theft or Promissory Estoppel." Hoffman's civil theft counterclaim similarly asserted that Layher had "provided no evidence detailing, much less, substantiating the allegations in [his] summons and complaint" and that the representations therein were made "with intent to defraud" Hoffman.

¶30 On appeal, Hoffman asserts that WIS. STAT. § 802.03(2) "requires pleadings that include fraud to be [pled] with particularity," and she claims that Layher's amended complaint failed to meet that standard.[4] She also asserts that Layher and his attorney failed to conduct an adequate pre-complaint investigation, as required by WIS. STAT. § 802.05(2)(c). Hoffman contends that the circuit court

---

[4] Layher's amended complaint asserted claims for breach of contract, breach of warranty, a violation of WIS. STAT. § 100.18, civil theft, and promissory estoppel. Hoffman does not clarify which of these claims she believes was subject to the heightened pleading standard in WIS. STAT. § 802.03(2). We note, however, that the circuit court awarded Layher damages based on Hoffman's violation of § 100.18, and the heightened pleading standard in § 802.03(2) does not apply to claims under that statute. *See Hinrichs v. DOW Chem. Co.*, 2020 WI 2, ¶83, 389 Wis. 2d 669, 937 N.W.2d 37.

"erred in not addressing this issue [by] requiring [Layher] to correctly plead his case with specificity to give [Hoffman] the opportunity to prepare a proper defense." Alternatively, Hoffman asserts that the court should have dismissed Layher's complaint.

¶31 Hoffman forfeited her argument that the circuit court should have dismissed Layher's complaint or required him to plead his claims with greater specificity by failing to request that relief in the circuit court. While two of Hoffman's amended counterclaims asserted that the allegations in Layher's complaint were not sufficiently detailed and that Layher did not perform an adequate pre-complaint investigation, Hoffman never moved to dismiss Layher's claims on those grounds, nor did she move for a more definite statement. *See* WIS. STAT. § 802.06(2)(a)6., (5). To preserve an issue for appeal, a party must raise the issue "with sufficient prominence such that the [circuit] court understands that it is called upon to make a ruling." *Schwittay v. Sheboygan Falls Mut. Ins. Co.*, 2001 WI App 140, ¶16 n.3, 246 Wis. 2d 385, 630 N.W.2d 772. Hoffman did not do so here, and we will not blindside the circuit court with a reversal based on a theory that did not originate in its forum. *See State v. Rogers*, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995).

¶32 To the extent Hoffman also means to argue that the circuit court erred by dismissing her counterclaims, we reject that contention. Hoffman had the opportunity to present evidence at trial in support of her counterclaims, but she failed to do so. She was represented by counsel on the second day of trial, and her attorney made no reference to her counterclaims during his closing argument. The court dismissed Hoffman's counterclaims, noting that Hoffman had presented "no evidence at all" to support them. On appeal, Hoffman does not point to any evidence introduced at trial that would have permitted the court to rule in her favor

on any of her counterclaims. As such, Hoffman has failed to show that the court erred by dismissing those claims.

### III. The circuit court's award of damages "in equity"

¶33     Next, Hoffman argues that the circuit court erred by awarding Layher damages on equitable grounds after Layher failed to prove either a breach of contract or a breach of warranty. Hoffman, however, misapprehends the basis for the court's award of damages. The court concluded that Layher had established a violation of WIS. STAT. § 100.18, and it awarded him damages for that violation. Although the court mentioned the concept of equity during its oral ruling, the court's ruling as a whole shows that it awarded damages based on a violation of § 100.18, not on equitable grounds.

¶34     Furthermore, we conclude that the evidence introduced at trial was sufficient to support the circuit court's determination that Layher established a violation of WIS. STAT. § 100.18. The sufficiency of evidence is a question of law that we review de novo, *see Lemke v. Lemke*, 2012 WI App 96, ¶28, 343 Wis. 2d 748, 820 N.W.2d 470, but we will accept the circuit court's factual findings unless they are clearly erroneous, *see* WIS. STAT. § 805.17(2). A finding of fact is clearly erroneous when it is against the great weight and clear preponderance of the evidence. *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615. "Under this standard, even though the evidence would permit a contrary finding, findings of fact will be affirmed on appeal as long as the evidence would permit a reasonable person to make the finding." *Sellers v. Sellers*, 201 Wis. 2d 578, 586, 549 N.W.2d 481 (Ct. App. 1996).

¶35     In this case, the circuit court did not make specific factual findings related to the elements of Layher's WIS. STAT. § 100.18 claim. Nevertheless,

"[w]hen the record does not include a specific finding on an issue, this court will assume that the issue was resolved by the trial court in a manner which supports the final judgment or order." *Freund v. Nasonville Dairy LLC*, 2019 WI App 55, ¶39, 389 Wis. 2d 35, 934 N.W.2d 913 (citation omitted). "Additionally, when a circuit court fails to make express findings of fact necessary to support its legal conclusion, we assume the court made such findings in a way that supports its decision." *Id.*

¶36    WISCONSIN STAT. § 100.18(1) "generally prohibits false, deceptive, or misleading representations or statements of fact in public advertisements or sales announcements." *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶38, 270 Wis. 2d 146, 677 N.W.2d 233. To prevail on a claim under § 100.18(1), a plaintiff must prove three elements: (1) that the defendant made a representation to the public with the intent to induce an obligation; (2) that the representation was untrue, deceptive, or misleading; and (3) that the representation caused the plaintiff a pecuniary loss. *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2007 WI 70, ¶19, 301 Wis. 2d 109, 732 N.W.2d 792.

¶37    A statement made to a single person may constitute a statement made to "the public" under WIS. STAT. § 100.18(1). *Kailin v. Armstrong*, 2002 WI App 70, ¶44, 252 Wis. 2d 676, 643 N.W.2d 132. More specifically, the statute applies to "oral representations" made by a seller "in private conversations to prospective purchasers" who responded to an advertisement. *See K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶¶21-23 (citing *State v. Automatic Merchandisers of Am., Inc.*, 64 Wis. 2d 659, 662, 221 N.W.2d 683 (1974)).

14

¶38     Layher testified at trial that when he asked whether Jack was aware of any problems with the truck, Jack responded, "No."[5]   That response was an affirmative representation about the truck's condition.  Given the context in which the representation was made, the circuit court could reasonably infer that Jack made the representation with the intent to induce an obligation—that is, with the intent to induce Layher to purchase the truck.

¶39     The evidence introduced at trial was also sufficient to support a determination that Jack's representation about the truck's condition was untrue, deceptive, or misleading.  Mitchell, who owned the truck before Jack, testified that he told Jack that the truck "burned some oil," leaked oil, and that the truck's "check engine" light came on periodically.  Jack then sold the truck to Layher approximately one month after purchasing it, even though it was his "dream truck."  The timing of the sale supports an inference that Jack sold the truck because he was aware of the problems with its engine.

¶40     In addition, when Layher came to look at the truck, Jack would not allow him to drive the truck on the highway, and Layher was only able to reach a maximum speed of fifteen to twenty miles per hour during the test drive.  Rodgers testified that the problems with the truck would have been more likely to manifest themselves at higher speeds.  These facts support an inference that Jack knew

---

[5] Layher argues that Jack was acting as Hoffman's agent for the purpose of selling the truck.  Layher also argues that a seller may be held liable for his or her agent's representations, even if the seller had no knowledge that the representations were made.  *See **Grube v. Daun**,* 173 Wis. 2d 30, 66, 496 N.W.2d 106 (Ct. App. 1992), *overruled on other grounds by **Marks v. Houston Cas. Co.**,* 2016 WI 53, 369 Wis. 2d 547, 881 N.W.2d 309.  Hoffman does not respond to these arguments in her reply brief, and we therefore deem them conceded.  *See **Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.**,* 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).

15

about the problems with the truck's engine and was attempting to conceal those problems from Layher prior to his purchase.

¶41 Moreover, Layher testified that he began experiencing significant problems with the truck almost immediately after purchasing it, particularly after driving the truck on the freeway. The day after the purchase, the truck's engine would not start. Rodgers testified that when his shop examined the truck, they "couldn't keep it running," "[p]arts fell on the ground," "[t]here was quite a bit of oil and fuel on top of the engine," there was oil in the fuel, and there was oil or fuel in the coolant. Rodgers opined that the truck's engine needed to be replaced. Based on all of this evidence, the circuit court could reasonably infer that Jack's representation to Layher that he was not aware of any problems with the truck was untrue, deceptive, or misleading.

¶42 Finally, the evidence at trial also permitted a determination that Jack's untrue representation caused Layher pecuniary loss. Layher testified at trial that he paid Jack $6,800 for the truck. He testified that the truck was worth nothing to him in its current state because it was inoperable, and he submitted evidence showing that the truck's scrap value was only $200. Layher also presented Rodgers' estimate of $14,421.64 to replace the truck's existing engine, which far exceeded the price Layher had paid for the vehicle. In addition, Layher testified that he would not have purchased the truck if he had known about the oil leak, the truck's oil usage, or the issue regarding the "check engine" light.

¶43 In her appellate briefs, Hoffman emphasizes evidence that could have supported a determination that Jack did not violate WIS. STAT. § 100.18. The evidence summarized above, however, supports the circuit court's contrary determination that Jack did violate that statute. While the court did not make

16

specific factual findings related to the elements of Layher's § 100.18 claim, the record supports the court's implicit findings that those elements were satisfied, and the court's implicit findings are not clearly erroneous. Again, under the clearly erroneous standard, a factual finding will be affirmed on appeal as long as the evidence would permit a reasonable person to make the finding, even though the evidence would also permit a contrary finding. *Sellers*, 201 Wis. 2d at 586. Accordingly, the court properly awarded Layher damages based on Jack's violation of § 100.18.[6]

## IV. Alleged misconduct by Layher's attorney

¶44 Hoffman also argues that Layher's attorney violated various Wisconsin Supreme Court Rules and that those violations warrant reversal of the circuit court's judgment. We note, however, that Hoffman cites no legal authority in support of the proposition that the alleged rule violations provide a basis for reversal. *See* SCR ch. 20, Preamble: A Lawyer's Responsibilities at [20] (explaining that the "violation of a rule does not necessarily warrant any other nondisciplinary remedy" and "[t]he fact that a rule is a just basis for a lawyer's

---

[6] As Layher correctly notes, any person who has suffered "pecuniary loss" because of a violation of WIS. STAT. § 100.18 "shall recover such pecuniary loss, together with costs, including reasonable attorney fees." *See* § 100.18(11)(b)2. The term "pecuniary loss" "is broad enough to encompass any monetary loss, including the full purchase price." *Mueller v. Harry Kaufmann Motorcars, Inc.*, 2015 WI App 8, ¶22, 359 Wis. 2d 597, 859 N.W.2d 451 (2014) (emphasis omitted). Here, the circuit court awarded Layher the purchase price of the truck, the cost that Layher paid to have the truck towed, plus attorney fees and costs. Hoffman does not develop any argument on appeal that the damages awarded by the court were improper.

As noted above, Hoffman argues that Layher failed to prove either a breach of contract or a breach of warranty. We need not address her arguments regarding those claims, however, as we conclude that the circuit court properly awarded Layher damages based on Jack's violation of WIS. STAT. § 100.18. *See Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (court of appeals need not address all issues raised by the parties if one is dispositive).

self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule"); *see also* ***Foley-Ciccantelli v. Bishop's Grove Condo. Ass'n***, 2011 WI 36, ¶173, 333 Wis. 2d 402, 797 N.W.2d 789 (Roggensack, J., concurring) ("The Preamble demonstrates that the purpose of the rules is not to provide remedies outside the realm of professional discipline."). We need not consider arguments that are unsupported by references to legal authority. ***State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

¶45 Regardless, Hoffman did not raise any arguments or objections regarding Layher's attorney's alleged rule violations in the circuit court. She did not inform the court that she believed Layher's attorney had violated any Wisconsin Supreme Court Rules, nor did she ask the court to rule in her favor based on any alleged rule violations. We therefore conclude that Hoffman forfeited these arguments by failing to raise them below, and we decline to address them further. *See* ***Tatera***, 328 Wis. 2d 320, ¶19 n.16; ***Van Camp***, 213 Wis. 2d at 144.

## V. "Discrepancies" in the circuit court's oral ruling

¶46 Finally, Hoffman asserts that we should reverse the circuit court's judgment based on eight alleged "discrepancies" in the court's oral ruling. For the most part, however, these "discrepancies" are merely instances where the facts were disputed, and the court made a factual finding—expressed or implied—based on evidence that favored Layher's position, rather than contrary evidence that favored Hoffman's position. As explained below, none of the factual findings that Hoffman highlights are clearly erroneous. *See* WIS. STAT. § 805.17(2).

¶47 For instance, Hoffman cites the circuit court's statement that after Layher purchased the truck and drove it for about thirty miles, "significant engine problems ensue[d]." Hoffman asserts that this statement is erroneous because "[t]he testimony was that the engine failed to start … because of a failed O-ring that would have cost $320.00 to fix," not "due to significant engine problems." Although Hoffman did introduce evidence suggesting that a failed O-ring could have caused the problems with the truck's engine, the court was not required to credit that evidence, particularly given that the individual who provided that opinion never actually inspected the truck. The court could instead find—based on Layher's testimony about the problems that he experienced with the truck and Rodgers' testimony about his shop's inspection of the vehicle—that "significant engine problems ensue[d]" after Layher purchased the truck. The court's finding in that regard is not clearly erroneous.

¶48 Hoffman next cites the circuit court's statement that Rodgers had "a significant amount of experience working with trucks and engines." In support of her claim that this statement is erroneous, Hoffman notes that Rodgers testified that he is not a "specialist" in 7.3 diesel engines and that he would not be qualified "to take the [truck's existing] engine apart." Rodgers also testified, however, that he had been in the automotive repair business for forty-nine years and that he generally works on gas and diesel truck engines. Based on that testimony, the court's finding that Rodgers had significant experience working with trucks and engines, as a general matter, is not clearly erroneous.

¶49 Hoffman also cites the circuit court's statement that Rodgers "certainly didn't testify that changing an [O]-ring would solve the problem." The court's statement in that regard was accurate, as Rodgers did not testify that changing an O-ring would solve the problems with the truck's engine. The fact

that another individual opined that changing an O-ring could solve those problems does not render the court's statement regarding Rodgers' testimony inaccurate or clearly erroneous.

¶50    Next, Hoffman contends that the circuit court "missed the distinction between Jack's testimony of his on-highway test drive *before* he purchased the truck and [Hoffman's] testimony that Jack had *not* driven the truck on the highway *after* he purchased it." During its oral ruling, the court stated that Hoffman testified that Jack had "driven [the truck] up and down the highway in Plover"— the location where Jack purchased the truck from Mitchell. The court then stated that Hoffman's testimony in that regard was "a little contrary" to Jack's testimony "that he didn't have a lot of experience driving" the truck.

¶51    The circuit court's summary of Hoffman's and Jack's testimony on this point was accurate. Jack testified that Quade drove the truck from Plover to Jack's home and that, thereafter, Jack only drove the truck "around the yard." The implication of Jack's testimony was that he had little experience driving the truck and, therefore, would not have known about any problems with its engine. Hoffman testified, however, that before purchasing the truck, Jack test drove it "on Highway I39, a freeway." Hoffman's testimony on that point suggested that Jack had more experience driving the truck than he had implied—including experience driving the truck at highway speeds. The court correctly acknowledged that there was at least an implicit contradiction in Hoffman's and Jack's testimony regarding the extent of Jack's experience driving the truck.

¶52    Hoffman also cites the circuit court's statement that Layher "certainly expected to get a working truck." Based on the evidence introduced at trial, this finding is not clearly erroneous. Hoffman argues that the truck *was* in

working order when Layher purchased it. The evidence showed, however, that Layher began experiencing problems with the truck almost immediately after the purchase and that the truck's engine would not start the following day. Under these circumstances, the court could reasonably find that Layher did not receive a working vehicle. Regardless, any dispute as to whether the truck was in working order at the time of the purchase does not render clearly erroneous the court's finding that Layher *expected* to receive a working truck.

¶53    Hoffman also disputes the circuit court's statement that "this wasn't a matter of changing an [O]-ring. This was a matter of dropping in a new engine." That finding, however, was supported by Rodgers' testimony that the truck needed a new engine. The court was entitled to accept Rodgers' opinion in that regard, and it was not required to accept the contrary opinion of Hoffman's mechanic, who had never actually inspected the truck. "When the circuit court sits as factfinder, it is the ultimate arbiter of the weight and credibility afforded to the evidence." *Bonstores Realty One, LLC v. City of Wauwatosa*, 2013 WI App 131, ¶33, 351 Wis. 2d 439, 839 N.W.2d 893.

¶54    Hoffman also criticizes the circuit court's statement that its resolution of the case was appropriate based on the evidence presented at trial and "the law I have reviewed." Hoffman asks, "What law did the [circuit] court find that upholds [a determination that] everyone deserves a warranty of unlimited time and scope?" The court did not, however, conclude that Layher—or anyone else—is entitled to an unlimited warranty when purchasing a vehicle. Rather, the court concluded that Layher was entitled to damages because he had established a violation of WIS. STAT. § 100.18. We have already concluded that the evidence at trial was sufficient to support that determination.

¶55     Lastly, Hoffman cites the circuit court's statement that "[t]here has to be a benefit of the bargain that's conferred and it has to last more than 30 minutes after a sale." Hoffman asserts that this statement "contradicts [WIS. STAT. § 402.316(3)(b)] because no warranty was given to [Layher] by [Hoffman]." Again, though, the court did not award Layher damages on a breach-of-warranty theory. The court's brief reference to the "benefit of the bargain" does not change the fact that the court properly awarded Layher damages based on a violation of WIS. STAT. § 100.18.

        *By the Court.*—Judgment affirmed.

        This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.